**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Werner BRUCHHAUSEN,**
**Defendant–Appellant.**

**No. 87–5143.**

United States Court of Appeals,
Ninth Circuit.

Submitted March 6, 1992.[*]

Decided Oct. 5, 1992.

---

1. The State of Missouri here acts through appellee Paul Delo.

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App.P. 34(a) and Ninth Circuit Rule 34–4.

Werner J. Bruchhausen, in pro. per.

William F. Fahey, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CANBY, KOZINSKI and FERNANDEZ, Circuit Judges.

CANBY, Circuit Judge:

Werner J. Bruchhausen appeals his conviction for wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2(b). We reverse.

## BACKGROUND

This case arises out of a scheme to smuggle American technology to Soviet Bloc countries. Bruchhausen, a German citizen, engineered the effort by deceiving the United States government and manufacturers. The deception spanned more than ten years and led to the diversion of millions of dollars in equipment.

Bruchhausen often relied on his American agents to deal directly with the manufacturers. With Bruchhausen's blessing, these agents assured company representatives that all equipment would be used in the United States. No manufacturer was told that the equipment actually was going to West Germany and then on to the Soviet Bloc. Representatives from these companies testified that they would never have sold to Bruchhausen had they known the truth.

The deception also took other forms. Bruchhausen's agents prepared two sets of invoices: one stating the shipment's true value, and a second reflecting only ten percent of this amount. The first invoice was sent to Bruchhausen in Germany. Meanwhile, the second invoice would accompany the delivery to freight forwarders and to United States Customs. Bruchhausen believed that this method would reduce the likelihood that officials would search the crates.

In addition, agents mischaracterized the shipments when preparing Shipper's Export Declarations. For example, they would label shipments of computers and military communications equipment as "electrical" or "meters." Further, Bruchhausen instructed them not to apply for export licenses in order to limit Customs' control over the shipments. Throughout the deception, Bruchhausen relied on telex machines to communicate with these agents.

On August 19, 1981, a federal grand jury indicted Bruchhausen and his confederates for offenses ranging from tax evasion to export violations. During the next four years, Bruchhausen eluded authorities. On May 8, 1985, however, British authorities apprehended him. He was extradited to the United States.

On June 6, 1985, a second grand jury indicted Bruchhausen on sixteen counts of wire fraud, in violation of 18 U.S.C. § 1343[1] and 18 U.S.C. § 2(b).[2] After a

---

1. The statute provides:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

    18 U.S.C. § 1343 (1984).

2. The statute provides:

bench trial, he was convicted of fifteen of these counts. On May 1, 1987, the district court sentenced Bruchhausen to fifteen years in custody and fined him $15,000. Bruchhausen appeals.

## DISCUSSION

■ Bruchhausen contends that the wire fraud indictment was insufficient as a matter of law. We review this issue *de novo. See United States v. Buckley,* 689 F.2d 893, 897–98 (9th Cir.1982), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983).

The indictment defined Bruchhausen's objectives as follows:

> a. [to] defraud American manufacturers of high-technology commodities of their property and their right to make business decisions based on truthful information and representations;

> b. [to] defraud the United States and its executive agencies, namely the Department of Commerce, the Department of State and the Customs Service of their right to conduct their affairs free from stealth, chicanery, fraud, false statements and deceit.

■ According to Bruchhausen, the indictment improperly relies on intangible property rights. This contention is without merit. The wire fraud statute is not limited to possessory interests, and can extend to rights in intangible property. *See Carpenter v. United States,* 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987) (information's "intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes"); 18 U.S.C. § 1346 (Supp.1992) (amending fraud statutes to include schemes to deprive another of "the intangible right of honest services").

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
> 18 U.S.C. § 2(b) (1984).

**3.** Congress overrode the result in *McNally* in 1988 by passing 18 U.S.C. § 1346, which pro-

■ The real question is whether the government's and manufacturers' interests can be considered property rights within the meaning of the statute. The government contends that two other statutes recognize its interest in the future alienation of American high technology products—the Arms Export Control Act, 22 U.S.C. § 2751 *et seq.,* and the Export Administration Act of 1979, 50 U.S.C. App. § 2401 *et seq.* To enforce these statutes, Congress enacted forfeiture provisions that permit the government to seize the products. 50 U.S.C. App. § 2410(g); 22 U.S.C. § 401(a). From these provisions, the government would have us derive a property right.

We reject this construct. The government's potential forfeiture interest is too ethereal to fall within the protections of a statute that "had its origin in the desire to protect individual property rights." *Cf. McNally v. United States,* 483 U.S. 350, 358–59 n. 8, 107 S.Ct. 2875, 2881 n. 8, 97 L.Ed.2d 292 (1987).[3] We accordingly hold that this interest cannot support Bruchhausen's indictment.

■ A closer question is whether the manufacturers were defrauded of "property" within the meaning of the statute. The manufacturers received the full sale price for their products; they clearly suffered no monetary loss. While they may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products after sale. It is difficult to discern why they had a property right to such post-sale control.

The government argues, however, that the manufacturers lost part of their bargain because they would not have sold the products if they had been told that the products were destined for the Soviet Bloc.

vides that a scheme to defraud includes a scheme "to deprive another of the intangible right of honest services." Section 1346 does not affect the analysis in *McNally* upon which we rely.

Thus, the assurance that the products would be used domestically was, in the government's view, part of the consideration for the sale, and the manufacturers were defrauded of that portion of their bargain. The government relies on *Carpenter v. United States*, 484 U.S. at 25–28, 108 S.Ct. at 320–22, in which the Supreme Court held that the Wall Street Journal was defrauded of "property" when its employees leaked to conspiring brokers the prepublication contents of columns discussing stocks. The Court stated that the Journal "had a right to decide how to use [the confidential information] prior to disclosing it to the public," and that a scheme to defraud did not "require[] a monetary loss." *Id.* at 26, 108 S.Ct. at 321. The government analogizes the Journal's intangible interest in controlling prepublication information to the manufacturers' intangible interest here in controlling the destination of their products.

The government's argument is not without force, but the analogy is a strained one. *Carpenter* relied in part on the fact that "[c]onfidential business information has long been recognized as property." *Id.* at 26, 108 S.Ct. at 320. There is no comparable understanding that a manufacturer has a property interest in the destination of its products. Of course the manufacturer may have an interest in assuring that its products are not ultimately shipped in violation of law, but that interest in the disposition of goods it no longer owns is not easily characterized as property.

If we are to rely on an analogy, *McNally* provides a closer one than *Carpenter*. In *McNally*, government employees purchasing insurance for the state required the seller to share its commissions with other companies in which the government employees had an interest. There was no showing that the state paid more for its policies than it otherwise would have, or that it received less insurance. The employees were convicted of mail fraud on a theory that their actions defrauded the citi-

zens and government of the state of their right to have the state's affairs conducted honestly. The Supreme Court reversed, holding that, under such a theory, no "property" had been taken by fraud within the meaning of the mail fraud statute, 18 U.S.C. § 1341. The Court noted that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally*, 483 U.S. at 356, 107 S.Ct. at 2880.

In *McNally* it was doubtless true that the state would not have permitted the policies to be purchased if it had known of the arrangement for sharing of commissions. Yet the state's or the citizens' legitimate interest in preventing dishonest redistribution of commissions paid by the government did not qualify as "property" within the meaning of the mail fraud statute. We see no reason why a similar result should not obtain under the wire fraud statute, the relevant language of which is identical to that of the mail fraud statute. We conclude, therefore, that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not "property" of the kind that Congress intended to reach in the wire fraud statute.

Our decision is colored by the rule of lenity. As the Court instructed in *McNally*, we may choose the harsher view of the statute only when Congress has spoken in clear and definite language. *Id.* at 359–60, 107 S.Ct. at 2881–82. Section 1343 provides no guidance, and section 1346 refers only to the intangible right to honest services. 18 U.S.C. §§ 1343, 1346. In the absence of definite language, we must conclude that the manufacturers' interest cannot support a criminal prosecution. *McNally*, 483 U.S. at 359–60, 107 S.Ct. at 2881–82.[4]

In light of this conclusion, we hold that the second indictment was insufficient as a matter of law. We therefore reverse

---

4. In this regard, we respectfully disagree with the Second Circuit's approach in *United States v. Schwartz*, 924 F.2d 410 (2d Cir.1991). In assess-

ing the manufacturer's interest, that court did not address *McNally* and *Carpenter*. *Id.* at 420–21.

Bruchhausen's convictions.[5] Bruchhausen may be subject to punishment under other statutes, but his alleged conduct does not constitute wire fraud against the United States or the manufacturers.

REVERSED; CONVICTION VACATED; REMANDED.

KOZINSKI, Circuit Judge, concurring:

Because the majority opinion and Judge Fernandez's concurrence are entirely consistent, and each interprets the applicable law correctly, I join both.

FERNANDEZ, Circuit Judge, concurring:

I agree with the majority that the United States was not defrauded of its property within the meaning of *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). I also agree that the right of manufacturers to make decisions based on truthful information is far too ethereal to be a property right for the purposes of the wire fraud statute. *See Carpenter v. United States*, 484 U.S. 19, 25, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987).

■ However, I do not agree that a person has not been defrauded of his property when he is induced by fraudulent representations to transfer that property to another. In reaching the contrary conclusion, the majority puts far too much weight on the fact that the defrauded companies received a monetary payment equal to the fair market value of the property.

In my opinion, at the very least ownership of a tangible object, whether it is a pen, a desk, or a piece of equipment, includes the right to retain that object and to refuse to transfer it to others. The right persists even if others are willing to pay fair market value for the object. Were it otherwise, everyone would have a private

right of condemnation over the property of others; everyone could simply take another's property at will as long as fair market value was paid. That concept is far outside our traditions. It is an acceptance of Holmes's "bad man" theory of the law which, though realistic in some sense, should not define this area. *See* Oliver W. Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 459–62 (1897). Perhaps a contracting party can properly consider the contract to be one to perform or pay damages, although I am dubious. Surely, however, the duty owed to a person who owns property is not merely a duty to respect that person's rights or pay damages. In short, a person can wrongfully invade another's property even when willing to pay fair market value. By the same token, a person can fraudulently deprive another of property even when willing to pay fair market value. The strictures an owner puts on his willingness to sell an item are not mere ephemera. When a prospective buyer lies in order to evade those strictures, a fraud has been committed upon the owner of the item just as surely as if the buyer had issued a rubber check.

This is not an exotic proposition. *See, e.g., Walker v. Galt*, 171 F.2d 613, 614 (5th Cir.1948) (" 'The vendor has the right to select the person to whom he will sell.... [F]raud may be predicated upon misrepresentations as to the identity of the purchaser....' ") (citation omitted), *cert. denied*, 336 U.S. 925, 69 S.Ct. 656, 93 L.Ed. 1086 (1949). *Cf., Earl v. Saks & Co.*, 36 Cal.2d 602, 610–13, 226 P.2d 340 (1951) (a contract can be rescinded when induced by fraud, even if no pecuniary harm has been suffered); 37 Am.Jur.2d *Fraud and Deceit* § 284 (1968) ("If one obtains from an owner, by a false representation of a fact which he deems material, property that he would not otherwise have parted with ... there is such an injury as will he redressed by equity."). Also, as the majority points

5. We find it unnecessary to address Bruchhausen's argument that the indictment failed to provide notice of the charges against him. We also decline to address his arguments based on the statute of limitations, the sufficiency of the evidence, and delay on appeal.

out, the Second Circuit agrees with the position taken in this concurrence. *United States v. Schwartz*, 924 F.2d 410, 420–21 (2d Cir.1991).

■ Here the various sellers simply refused to sell to persons like Bruchhausen who intended to export equipment from the United States without permits. Indeed, at least one of them, Watkins–Johnson Co., required a certification that the property would stay in the United States, period. If a buyer would not certify to that, the company would not sell its goods to that buyer. When Bruchhausen lied in order to evade that condition, he did commit a fraud. That fraud was the obtaining of the property of another (the equipment) by means of false representations. Thus, I cannot agree with the majority's conclusion that Bruchhausen's behavior could not constitute a violation of the wire fraud statute.

■ Nevertheless, I concur in the result reached by the majority. This case was tried before *McNally* and did not focus on the concept of a tangible deprivation of property, even though there was evidence to support a determination on that basis. Thus, the finding of guilt was at best based upon an undefined mixture of legal theories too ephemeral to support that finding and an essentially unarticulated legal theory which would support it. Given that, *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), militates in favor of the majority's determination. I say this with much hesitation because we deal here with a bench trial rather than with a jury trial. Here, however, given the fact that *McNally* overturned what had long been our approach to the wire fraud statute, it would be taking theory to an extreme to insist that the learned district judge who presided over this case could have been following the *McNally* strictures. *See, e.g., United States v. Bohonus*, 628 F.2d 1167, 1170–73 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980). Moreover, the district judge's comments made it rather clear that

she was not following the *McNally* approach and that she saw the whole matter as one unified decision rather than as discreet legal elements which supplied alternate pathways to a finding of guilt.

Thus, I concur in the result.