**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

MIRZA ALI,
        *Defendant-Appellant.*

No. 07-10529

D.C. No.
CR-02-40081-CW

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

SAMEENA ALI,
        *Defendant-Appellant.*

No. 07-10539

D.C. No.
CR-02-40081-CW

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

KEITH W. GRIFFEN,
        *Defendant-Appellant.*

No. 07-10542

D.C. No.
CR-02-40081-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia A. Wilken, District Judge, Presiding

Argued and Submitted
November 2, 2009—San Francisco, California

Filed August 25, 2010

12805

Before: Pamela Ann Rymer, M. Margaret McKeown, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

## COUNSEL

Karen L. Landau, Oakland, California, for appellant Sameena Ali.

Chris Cannon, San Francisco, California, for appellant Mirza Ali.

David J. Cohen, Bay Area Criminal Lawyers, PC, San Francisco, California, for appellant Keith Griffen.

Joseph P. Russoniello, Barbara J. Valliere, and Hartley M. K. West, for appellee, the United States of America.

## OPINION

N.R. SMITH, Circuit Judge:

This case arises from a scheme whereby Mirza Ali, Sameena Ali, and Keith Griffen (collectively "Defendants") purchased Microsoft software at discounted prices then resold the software for a profit. The case calls upon us to interpret and apply the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. Significantly, we hold Defendants were properly convicted of mail and wire fraud, because (1) a right to payment of money for the sale of software is "money or property" as defined in 18 U.S.C. §§ 1341 and 1343, and (2) neither statute requires a transfer directly to the defendant from the party

deceived by the defendant. Further, sufficient evidence sustains all of the convictions with the exception of the promotion money laundering counts. Lastly, the district court did not err with regard to sentencing or with respect to Sameena Ali's motion for substitute counsel.

## FACTUAL AND PROCEDURAL HISTORY

### A.    Microsoft's Software Distribution System

Microsoft sells software[1] in a variety of ways, one of which is Microsoft's Authorized Education Reseller ("AER") program. Through the AER program, Microsoft sells Academic Edition ("AE") software. While the AE software is in all relevant ways equivalent to the retail version, Microsoft sells its AE software only to authorized distributors, who have agreed to sell the AE software only to AERs. These AERs have agreed to sell the AE software only to qualified educational users. Microsoft charges distributors of AE software a much lower price than it charges distributors for comparable non-academic editions. Distributors in turn generally sell AE software to resellers at a lower price than non-AE software.

In order to become an AER, an entity must submit an application to Microsoft. As part of the application process, the entity promises, *inter alia*, to abide by the resale restrictions on AE software imposed by Microsoft. Upon approval of the application, the AER agreement requires that, if an AER sells software in violation of the agreement, the AER would be liable to Microsoft for "the difference between [Microsoft's] estimated retail price for AE product and . . . commercial versions of the same products."

---

[1]As is common in the software industry, Microsoft does not "sell" its product in the traditional sense of the word. Rather, Microsoft licenses its software to end users. Nevertheless, because even within the industry such transactions are referred to as "sales," we use that terminology here.

## B.  Defendants' Buying and Selling of AER

Defendants devised a scheme to fraudulently attain AER status for various companies and then sell AE software to unauthorized users (those who did not qualify as educational users). Defendants first began purchasing AE software through a company called Samtech Research, Inc. ("Samtech"). Sameena Ali was president of Samtech and, while president, submitted an AER application to Microsoft on behalf of the company in September 1996. Microsoft reviewed and approved the application, thereby allowing Samtech to act as an AER. Over the course of the next four or five months, Samtech purchased about $3.4 million of AE product. In January 1997, Microsoft terminated Samtech's AER agreement, because Samtech was in breach of the agreement for selling AE software to unauthorized users. Undeterred, over the next four years, all three Defendants engaged in a scheme whereby they (1) created new companies under false names and (2) purchased existing companies (which were already AERs) in order to continue acquiring AE software from Microsoft. Over this period, Defendants' companies acquired approximately $30 million of AE software. Defendants did not buy AE software directly from Microsoft but rather purchased the software from other AERs. Had Microsoft known of Defendants' involvement, the parties both agree and have stipulated that Microsoft would not have authorized Defendants' companies as AERs (which would have prevented Defendants from acquiring AE product from Microsoft or other AERs). Defendants resold the AE product to 120 different entities, 90% of which were unauthorized to purchase AE software. Defendants used the mail and wires as part of this scheme.

## C.  Disposition of the Proceeds of the Sales

The Alis owned four bank accounts into which they deposited proceeds from the sale of the AE software. They used funds from these accounts to purchase nominee companies,

additional software, and real property in the name of their son. They also transferred some of the funds from these accounts to Pakistan. Additionally, they used proceeds from the sales of AE software to purchase real property at 9900 Longview Lane, Pleasanton, California and 1069 Canyon Creek Terrace, Fremont, California. These transactions are the bases of the money laundering charges.

## D.   Indictment and Trial

A grand jury in the Northern District of California indicted Mirza Ali, Sameena Ali, Keith Griffen, and William Glushenko[2] of mail fraud, wire fraud, and money laundering on April 10, 2002.

On March 19, 2003, citing difficulties in the relationship with his client, Sameena Ali's appointed counsel moved to withdraw, at Sameena Ali's request. The court referred the motion to the magistrate court for further review and to determine whether Sameena Ali was eligible for appointed counsel. However before referral, the court informed counsel and Sameena Ali that they could revisit the motion if they could not mend their differences. The magistrate found that Sameena Ali was eligible for appointed counsel, but neither counsel nor Ali herself raised the motion before the court again.

On March 10, 2005, the grand jury returned a 31 count superseding indictment. Count 1 of the indictment charged conspiracy to commit mail and wire fraud under 18 U.S.C. § 371, Counts 2-5 charged mail fraud in violation of 18 U.S.C. § 1341, Counts 6-9 charged wire fraud in violation of 18 U.S.C. § 1343, Count 10 charged conspiracy to launder money under 18 U.S.C. § 1965(h), Counts 11-20 charged promotion money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), Counts 21-26 charged concealment money laundering under

---

[2]Glushenko pleaded guilty, did not stand trial with the defendants named in this appeal, and is not party to this appeal.

18 U.S.C. § 1956(a)(1)(B)(i), Counts 27-30 charged exportation money laundering under 18 U.S.C. § 1956(a)(2)(B)(i), and Count 31 charged criminal forfeiture under 18 U.S.C. § 982. Mirza and Sameena Ali were charged with all 31 counts, and Keith Griffen was charged with counts 1-9.

On March 6, 2006, Defendants waived their right to a jury trial. Instead they entered into an agreement with the government for a bench trial based on stipulated facts, but limiting the sentence to a maximum of 60 months for the Alis and 33 months for Keith Griffen. After trial, the court found all three Defendants guilty on Counts 1-9 and Mirza and Sameena Ali guilty on Counts 10-31.

*E. Sentencing*

The court sentenced Mirza and Sameena Ali to 60 months incarceration and three years' supervised release on each count, running concurrently, $20 million restitution, and a forfeiture judgment of about $5 million. The pre-sentence report had calculated 60 months as the appropriate range for count one and 121-151 months for counts 2-30 based on the sentencing guidelines and seriousness of the offenses. (Again, count 31 charged criminal forfeiture.) However, the report finally recommended a total sentence of 60 months, because the parties had agreed to a 60-month cap when they stipulated to the facts and agreed to the bench trial.

The court sentenced Keith Griffen to 33 months incarceration and three years supervised release (on each count), and $20 million restitution. Like the Alis, the pre-sentence report calculated a longer sentence (46-57 months) based on the guidelines, but ultimately recommended 33 months based upon the pre-trial agreement.

As to the restitution amount, the judge relied upon spreadsheets prepared by IRS agents to calculate Microsoft's loss at $20 million. The agents prepared these spreadsheets based on

an analysis of Defendants' bank records as well as invoices from Microsoft's distributors. With regard to all Defendants, the court pointed out that the sentences imposed would still fit the guideline range, even if the loss amount were later determined (possibly by a higher court) to be much lower (as low as $200,000). The district court also confirmed that it would impose the same sentences even if the loss were smaller.

Defendants appeal their convictions, arguing: (1) the indictment was insufficient in that it failed to state an offense because Defendants did not take "money or property" from Microsoft; (2) there is insufficient evidence to support their convictions; and (3) their sentences are substantively unreasonable and the district court erred in its calculation of their sentences. Sameena Ali appeals the district court's actions with respect to her motion for substitute counsel.

## DISCUSSION

### I.  A right to payment is "money or property" under 18 U.S.C. §§ 1341 and 1343.

*A.  Standard of Review*

We review *de novo* a district court's construction of a criminal statute. *United States v. Blixt*, 548 F.3d 882, 886 (9th Cir. 2008). We also review *de novo* a district court's denial of a motion to dismiss an indictment for failure to state an offense. *Id.*

*B.  Analysis*

**[1]** Mail and wire fraud are both defined as "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. Defendants challenge their convictions on the ground that the indictment failed to state an offense under either statute, because Microsoft was

only deprived of "potential profits" which are not "money or property" under the law. We do not agree.

There are four main Supreme Court cases interpreting the phrase "money or property" in the relevant statutes: *McNally v. United States*, 483 U.S. 350 (1987), *superseded by statute*, 18 U.S.C. § 1346; *Carpenter v. United States*, 484 U.S. 19 (1987)*; Cleveland v. United States*, 531 U.S. 12 (2000); and *Pasquantino v. United States*, 544 U.S. 349 (2005). *McNally*, chronologically first, held that the definition of property does not reach "the intangible right of the citizenry to good government." *McNally*, 483 U.S. at 356. Later that same year in *Carpenter*, the Court clarified that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Carpenter*, 484 U.S. at 25. In *Carpenter*, the Court also held that "[c]onfidential business information" qualified as property under the mail fraud statute. *Id.* at 26. *Cleveland* held that business licenses issued by a state "do not qualify as 'property' within § 1341's compass." *Cleveland*, 531 U.S. at 15. The Court went on to explain that to qualify as property "the thing obtained must be property in the hands of the victim." *Id.*

**[2]** Finally, in *Pasquantino*, the Supreme Court held that "an entitlement to collect money from [a party]" is money or property under the mail and wire fraud statutes. 544 U.S. at 355. In *Pasquantino*, the defendants engaged in a scheme to avoid Canadian excise taxes on liquor. The Court found that the defendants were attempting to "deprive Canada of money legally due," *id.* at 356, and that "Canada's right to uncollected excise taxes . . . is 'property' in its hands," *id.* at 355. Under this line of cases, we conclude that Microsoft's right to full payment for that software is "money or property." Microsoft had a right to full payment for its software and was deprived of that right when Defendants fraudulently obtained the software for less than full payment. We therefore reject Defendants' characterization of Microsoft's loss as only the expectation of "potential profits." It does not affect our analy-

sis that Defendants obtained the software through third party distributors. Microsoft only sold the software to those distributors with the agreement that it would only be resold to other AERs or to AE users. The mere fact that the software traveled through other hands on its way from Microsoft to Defendants is immaterial: Microsoft sold the software only for limited distribution and Defendants fraudulently obtained it for indiscriminate distribution.[3]

Of course, in some transactions, Defendants did not obtain the software directly from Microsoft. Thus, Defendants argue that this right to payment was not "property in the hands of the victim" as *Cleveland* requires. *Cleveland*, 531 U.S. at 15. Defendants are mistaken. Here, Microsoft's third party resellers were not deprived of any payment: they purchased software licenses at the wholesale AE price and resold the licenses for a corresponding price. Microsoft, on the other hand, had a right to full payment when the software was sold outside the AE restrictions by Defendants. Just as the Canadian government's deprivation of payment rightly due was "in its hand," here, Microsoft—the only party deprived of proper payment—lost property "in its hand."

Defendants contend that these cases together stand for the proposition that only "traditionally recognized forms of property" constitute property under the statutes. Defendants then argue that the right to be paid is not traditionally recognized as a form of property. *Pasquantino* prevents us from accepting their argument.

Defendants, citing our opinion in *United States v. Bruch-*

---

[3]Because we conclude that Microsoft's right to payment for that software is money or property under the statute, we need not address the cases cited by Defendants holding that market share (*Lancaster v. Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991)) and contract rights (*TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.*, 913 F.2d 676 (9th Cir. 1990)) are not money or property.

*hausen*, 977 F.2d 464 (9th Cir. 1992), also argue that Microsoft was only deprived of post sale control of its software, not of any money or property. This argument fails, because Microsoft was deprived of more than downstream control in this case. Defendants are correct that, in *Bruchhausen*, we held that the right to control the future sales of property is not an interest cognizable as property under the mail fraud statute. *Id.* at 467. There the defendants had made false representations in order to obtain firearms which they then sold to foreign nations. *Id.* at 466. The manufacturers would not have sold the weapons had they known the defendants' true intent. *Id.* We found that there was no property interest of the manufacturers at stake in that case. *Id.* at 467.

*Bruchhausen* is substantially different from the case at bar. There, the defendants paid full price for the firearms and did not use the misrepresentations in order to obtain a different price. Here, Microsoft's loss was not the lost ability to control the downstream disposition of its products, but lost revenue when the products were sold at a discount as a result of the fraud. Thus, Microsoft's right to receive full payment for its product mirrors the loss of taxes due in *Pasquantino* and not a mere loss of control as in *Bruchhausen*.

The Tenth Circuit made a similar distinction in *United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989). There the defendants obtained pharmaceuticals at a discounted cost based on their fraudulent representations of how they intended to distribute the drugs. The defendants in *Stewart* argued that the only thing they had deprived the manufacturer of was the business expectation relating to how the products would be sold, but the Tenth Circuit disagreed. That court found that the defendants had, in actuality, taken from the manufacturers "money which they should have received on sales of pharmaceuticals to wholesalers." *Id.* at 960; *cf. United States v. Nelson*, 988 F.2d 798 (8th Cir. 1993) (holding defendants deprived IBM of property where they fraudulently obtained computer components at reduced prices). We agree with this

analysis and hold that here, like in *Pasquantino* and *Stewart*,[4] Defendants deprived the victim of money properly due based on the nature of the transaction.

**[3]** Defendants also argue, in the alternative, that even if a right to payment constitutes property, "the stipulated facts do not establish that Microsoft lost any future profits." Defendants make this argument, because the stipulated facts do not state that consumers who purchased AE software from Defendants would have otherwise purchased full price software. This argument is misplaced. It does not matter whether those who purchased lower priced software from Defendants would have paid the higher price otherwise. Rather, the fact that Defendants acquired the lower priced software when they should have paid the higher price establishes Microsoft's loss.[5]

**II.  There was sufficient evidence for the district court to find (1) Defendants guilty of the mail and wire fraud charges and (2) the Alis guilty of conspiracy to launder money, concealment money laundering, exportation money laundering, and criminal forfeiture. However,**

---

[4]Defendants attempt to distinguish *Stewart*, because there the defendants purchased the pharmaceuticals directly from the manufacturer. This argument is not compelling. Microsoft lost payment rightly due as a result of the Defendants' misrepresentations, regardless of the fact that the software was not purchased directly from Microsoft.

Defendant Griffen makes the related argument that, because there was no agency relationship between Microsoft and its distributors and Microsoft was paid the full AE price for the software, Microsoft was not deprived of anything as a result of Defendants' conduct. We disagree. Again, it is not necessary that Defendants obtain the property directly from Microsoft or an agent in order to engage in a scheme to defraud Microsoft.

[5]We also note that defendant Griffen argues that the rule of lenity should apply with regard to the definition of property under the statutes. The rule of lenity only applies when the application of a term is ambiguous. In the context of this case, "property" is not ambiguous and, therefore, this argument is unavailing.

**there is insufficient evidence to support the Alis' convictions for promotion money laundering.**

*A. Standard of Review*

"There is sufficient evidence to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

*B. Analysis*

### 1. Mail and Wire Fraud

Mail and wire fraud both consist of using the mail or wires in "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341, 1343. Furthermore, as explained in more detail below, courts have interpreted these statutes to require that the property taken come from the "victim" of the deception.

Defendants challenge the sufficiency of the evidence as to the mail and wire fraud charges[6] in three ways: (1) the evidence was insufficient to show Microsoft was deprived of property; (2) the evidence was insufficient to show that Microsoft was the "victim" of the fraud; and (3) based on the evidence, this case is only about a violation of antitrust or copyright law, not mail or wire fraud.

---

[6]Defendants do not separately challenge the conspiracy to commit mail and wire fraud under Count 1. Rather, Defendants only challenge conspiracy inasmuch as they challenge the sufficiency of the evidence as to the mail and wire fraud charges themselves.

a.

We have already addressed Defendants' first challenge. There is sufficient evidence to show that Microsoft was deprived of money or property because Microsoft's right to proper payment for its software is money or property within the meaning of the statute. Furthermore, not only was Microsoft properly entitled to the payment, no other party—including the authorized distributors—was deprived of any right to proper payment.

b.

**[4]** Second, Defendants contend that precedent requires that Microsoft be the "victim" of the fraud and that the evidence is insufficient to support such a finding here. There are two relevant cases on this point. First, *Cleveland* requires that the property taken be property "in the hands of the victim," 531 U.S. at 15, suggesting that at least some level of convergence between the fraud and the loss is required. Second, we held in *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), that, for mail fraud, "the intent must be to obtain money or property from the one who is deceived." *Id.* at 221.

**[5]** *Cleveland* cannot be read to mean the property must actually be taken directly from the victim; depriving a victim of property rightfully due is enough. *See Pasquantino*, 544 U.S. at 355-56 (holding that Canada's right to receive tax payments on imported liquor was " 'property' in its hands" under *Cleveland*). On sufficiency of the evidence review, viewing the evidence in the light most favorable to the government, we hold that Microsoft's right to full payment was "property in its hands" under *Cleveland* and *Pasquantino*.

**[6]** In *Lew*, we held that for mail fraud, "the intent must be to obtain money or property from the one who is deceived." 875 F.2d at 221. Defendants made misrepresentations directly to Microsoft in order to obtain AER status. Defendants rightly

point out, however, with respect to the companies (already certified as AERs) purchased by Defendants, that Defendants made no misrepresentation directly to Microsoft.[7] We nevertheless conclude that there is sufficient evidence to support Defendant's convictions with respect to all the transactions.

[7] The Defendants' acquisition of companies with AER status was part of a larger scheme to defraud Microsoft, so Defendants need not have made a misrepresentation directly to Microsoft in order to be guilty of mail and wire fraud. "Under the mail fraud statute the government is not required to prove any particular false statement was made. Rather, there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements." *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir. 2000) (citations omitted), superseded by statute, 18 U.S.C. § 2B1.1. Defendants acquired these AER companies as part of an overall scheme to defraud Microsoft, in which they made misrepresentations to Microsoft. Therefore, we conclude that there is sufficient evidence to demonstrate that Defendants were engaged in a scheme to defraud Microsoft, even if there were no specific false statements made to Microsoft.

Further, under *Lew*, Microsoft must be the victim from whom property was taken. Again, we have no trouble finding

---

[7]The parties do not cite any case that stands for the proposition that Defendants had a duty to disclose that they were purchasing companies that had previously been certified as AERs even though they knew Microsoft would have likely terminated the agreements had Microsoft known Defendants were in possession of these companies. While Defendants did purchase and establish nominee companies in order to shield their identities from Microsoft, this court has held in a RICO case that "[a]bsent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a fraudulent scheme." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987). Here, Defendants had no independent duty to disclose their identities to Microsoft in connection with the purchase of these companies.

sufficient evidence to show that Microsoft was deprived of its right to payment for its software and that Defendants deprived Microsoft of this money or property, even though the transfer also involved third party distributors.

Defendants counter that, at most, they are only in breach of contract with Microsoft and that a contract dispute is not itself grounds for mail or wire fraud. Defendants cite the Eleventh Circuit in *United States v. Chandler*, 388 F.3d 796, 800 (11th Cir. 2004) and the Second Circuit in *United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002), *overruled on other grounds by United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), which both came to the conclusion that the mail and wire fraud statutes cannot be read to criminalize every breach of contract. Further, *Chandler* found that the object of mail or wire fraud must be the underlying criminal behavior. *Chandler*, 388 F.3d at 804-05.

We do not read *Handakas* or *Chandler* to preclude Defendants' criminal prosecution in this case. The simple fact that Microsoft *may* have brought a civil contract claim against Defendants does not immunize Defendants' conduct from criminal prosecution if that conduct meets the elements of the criminal statutes as well. Further, we need not decide if *Chandler* is correct that underlying criminal activity is always necessary; the criminal activity in this case is straightforward. Defendants' deprived Microsoft of revenue when they purchased AE software through false pretenses.

c.

Third, Defendants argue that this case is controlled by copyright or antitrust law, not fraud. Even if Microsoft were in violation of copyright or antitrust law, the appropriate remedy would be found in copyright or antitrust law, and such illegal behavior by Microsoft would not immunize Defendants' fraud. *United States v. Weinstein*, 762 F.2d 1522, 1533 (11th Cir. 1985) (whether a pricing scheme is illegal is imma-

terial to the issue of fraud because "[i]f defendants doubted the legality of that practice their recourse would have been through antitrust action, not through a scheme of misrepresentations communicated through U.S. mails and wires").

## 2. Money Laundering

**[8]** In order to show money laundering, 18 U.S.C. § 1956(a)(1) requires the government to prove that a defendant participated in a financial transaction using the "proceeds" of an unlawful activity. "Proceeds" generally means "that which is obtained . . . by any transaction." *United States v. Akintobi*, 159 F.3d 401, 403 (9th Cir. 1998) (quotation marks omitted). More recently, we have recognized that this broad definition must be narrowed in certain contexts. *See United States v. Van Alstyne*, 584 F.3d 803, 814-15 (9th Cir. 2009) (discussing *United States v. Santos*, 553 U.S. 507 (2008)). Specifically, we distinguish between the profits and gross receipts of an illegal venture when defining proceeds as gross receipts results in the merger of two crimes charged against a defendant. *Id.* at 810. This "merger" problem arises when a money laundering count essentially serves to increase the sentence for the very same behavior constituting the underlying criminal violation. *Santos*, for example, dealt with an illegal lottery. 553 U.S. at 507. Payments to lottery winners from the gross receipts of the operation are necessary to the function of the illegal activity and, categorizing such payments as promotion money laundering also essentially increases the penalty for conducting an illegal lottery. *See Van Alstyne*, 584 F.3d at 810. By showing that profits (as opposed to gross proceeds) are used in furtherance of the illegal operation, a merger problem is avoided. *Id.* at 814. Likewise, use of proceeds (whether they be profits or not) *outside* the illegal operation does not implicate the merger problem, making the distinction between gross proceeds and profits irrelevant in that context. *United States v. Fernandez*, 559 F.3d 303, 317 (5th Cir. 2009) (holding that use of receipts outside of the criminal enterprise necessarily means that those receipts are

profits as the funds are, necessarily, not needed to run the operation).

**[9]** In the case at bar, the Alis were convicted of: 10 counts of promotion money laundering under 18 U.S.C. § 1956(a)(1)(A)(i); six counts of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i); and four counts of exportation money laundering under 18 U.S.C. § 1956(a)(2)(B)(i). With respect to all of these counts, the government did not specifically show that profits were used to conduct the money laundering activities. The Alis only challenge the sufficiency of the evidence as to their convictions for money laundering,[8] based on this failure to show that profits were used in the transactions. Under the *Van Alystne* standard, the money laundering charges will only be supported by sufficient evidence if there is no merger problem.

**[10]** The Alis' convictions for promotion money laundering cannot stand. The government did not show that profits were used to purchase additional software and companies in furtherance of Defendants' scheme. Under *Van Alstyne*, without such a showing, a conviction for promotion money cannot be supported. Just as an illegal lottery will pay winners, an illegal scheme to buy and sell discounted software will continue to buy and sell software to perpetuate the scheme. Thus, the promotion money laundering counts implicate the merger problem discussed in *Van Alstyne* and *Santos* and, because the government did not show that only profits were used, there is insufficient evidence to support the Alis' conviction under the promotion money laundering counts.[9]

**[11]** The same is not true with respect to the counts for concealment and exportation money laundering. The Alis

---

[8]As with the fraud charges, the Alis do not separately challenge the conspiracy to commit money laundering count.

[9]We note that *Van Alstyne* was decided after the district court handed down its decision in this case.

stipulated that they used proceeds from the software operation (1) to purchase two parcels of real estate and (2) in transfers of funds from the United States to Pakistan. These uses of the funds do not implicate the merger problem, as they were used for purposes outside the scheme to defraud Microsoft. Thus, the distinction between profits and proceeds is not relevant as to these counts. Because Defendants stipulated that proceeds of the illegal operation were used in these transactions, there is sufficient evidence to sustain the Alis' convictions for concealment money laundering and exportation.

### 3. Criminal Forfeiture

**[12]** Because the concealment and exportation money laundering counts are supported by sufficient evidence, we also affirm the criminal forfeiture count. We need not reach the Alis' argument that, in the indictment, the criminal forfeiture count was never based on mail or wire fraud.

### III. The district court did not err with regard to the sentences imposed.

Defendants present four challenges to the sentences imposed by the court.

### A. *Standard of Proof*

First, Defendants argue that the court applied an incorrect standard of proof with regard to the calculation of loss. Specifically, Defendants contend that the court should have required the government to prove loss by clear and convincing evidence. The government concedes that the district court applied a preponderance of the evidence standard to calculate the loss here, but argues that this was not error.

**[13]** We hold that the district court did not err in using a preponderance of the evidence standard. In *United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003), we held that courts

should look to a "totality of the circumstances" when determining what standard to apply in sentencing and that the clear and convincing standard is appropriate when "contested enhancements would have 'an extremely disproportionate effect on the sentence imposed.' " *Garro*, 517 F.3d at 1168 (citation omitted). In this case, the sentences and the loss calculated are not extremely disproportionate. The sentences are well within the maximum sentence for mail and wire fraud (30 years) and the court reduced the loss calculations to fit within the agreed upon sentence caps. Furthermore, we decline application of the clear and convincing standard for establishing losses in fraud cases where the losses are "based on conduct for which [defendant] was charged and convicted." *United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008). Here, the loss being calculated was based on the Defendants' charged and convicted conduct.

## B.   *Calculation of the Loss*

Defendants challenge the district court's method of calculating loss. A district court's method of calculation is reviewed *de novo* while the determination of the amount is reviewed for clear error. *See United States v. Santos*, 527 F.3d 1003, 1006 (9th Cir. 2008).

**[14]** The district court relied upon spreadsheets, created by IRS agents, that approximated the difference between the full retail price of the software sold by Defendants and the AE price Defendants paid for it. Though these spreadsheets were admittedly hearsay, the district court was justified in relying upon them. *See United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) ("[H]earsay is admissible at sentencing, so long as it is accompanied by some minimal indicia of reliability.") (citation and internal quotation marks omitted). The spreadsheets contained substantial detail and were reviewed both by the IRS agents (who also sent in sworn affidavits regarding the methodology) and Microsoft consultants who reviewed the information. Therefore, the district court did not

err in its method of calculation of the loss. There is sufficient indicia of reliability for the district court to have relied on these spreadsheets.[10]

Given this record, the determination of the loss amount was not clearly erroneous. The district court made "a reasonable estimate of the loss, given the available information." *United States v. Bussell*, 504 F.3d 956, 960 (9th Cir. 2007) (citation and internal quotation marks omitted).

## C.  *Reasonableness of the Sentence*

Defendants argue that the district court failed to impose a substantially reasonable sentence by failing to consider the factors in 18 U.S.C. § 3553(a)(2). "We consider the substantive reasonableness of a sentence under an abuse-of-discretion standard." *United States v. Carter*, 560 F.3d 1107, 1120 (9th Cir. 2009) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). A district court need not provide a lengthy explanation of the § 3553 factors in order for its explanation to be sufficient. *See Rita v. United States*, 551 U.S. 338, 356 (2007).

[15] Defendants contend that the court already had in mind the desired sentence (the agreed upon cap) and, therefore, did not adequately take into account the § 3553(a) factors. The record does not support Defendants' argument. During sentencing the district court specifically stated, "I still think that the sentences that were agreed upon were the appropriate sen-

---

[10]Defendants present a related argument that, because the government did not adequately prove loss, the court ordered $20 million in restitution was in error. A restitution order itself is reviewed for abuse of discretion, while the "factual findings supporting [the] order . . . are reviewed for clear error" and the "valuation methodology . . . reviewed de novo." *United States v. Da Liu*, 538 F.3d 1078, 1090 (9th Cir. 2008) (citations omitted). For the same reasons noted with the loss argument with regard to sentencing, $20 million was a reasonable estimate of Microsoft's loss and the district court did not abuse its discretion in ordering restitution.

tences pursuant to a departure from the guidelines, as well as, pursuant to the 3553 Sections." Defendants' contention that the court abused its discretion by failing to consider the § 3553(a) factors is wholly without merit.

## D.   Sentencing Methodology

Defendants present the related argument that the district court's sentencing methodology was flawed, in that the court already had in mind the desired sentence prior to analyzing the guidelines or other sentencing criteria. We review "the district court's application of the Guidelines to the facts for abuse of discretion." *Garro*, 517 F.3d at 1167.

**[16]** Defendants' argument fails. Again, the court explicitly stated that "I still think that the sentences that were agreed upon were the appropriate sentences pursuant to a departure from the Guidelines." The court considered the guidelines and imposed what it felt was the appropriate sentence, Defendants present no persuasive argument that this was an abuse of the district court's decision.

## E.   Harmless Error

**[17]** Finally, even if the district court did err in any of the respects outlined by Defendants, any error was harmless. When an "alleged error is harmless [it is] not a ground for resentencing." *Garro*, 517 F.3d at 1169 (citing *United States v. Crawford*, 185 F.3d 1024, 1029 (9th Cir. 1999)). All the departures made by the court were to *lessen* the sentences the court could have imposed on Defendants. If there was any error, the error was harmless in that there is no evidence any of these alleged errors, if changed, would result in a shorter sentence for any of the Defendants. Indeed, the court stated that, even if the loss calculation were much different, based on the § 3553(a) factors, the same sentences would have been imposed.

**IV. The district court did not err with regard to Sameena Ali's request for substitute counsel.**

A district court's denial of a request for substitute counsel is reviewed for an abuse of discretion. *United States v. George*, 85 F.3d 1433, 1438 (9th Cir. 1996).

Sameena Ali contends that the district court abused its discretion in denying her motion for substitute counsel. However, the district judge did not deny this motion. When presented with the motion for substitute counsel, the district judge expressed some concern over whether Sameena Ali was actually eligible for court appointed counsel and whether appointment of substitute counsel would solve any problems. Thus, the district judge referred the matter to the magistrate judge and invited counsel and Sameena Ali to revisit the substitute counsel issue if (1) Sameena Ali was eligible and (2) Sameena Ali and her attorney could not work out their differences. Notwithstanding this invitation, they did not again bring the matter before the district judge after the magistrate ruled that Sameena Ali was indeed eligible for court appointed counsel. Sameena Ali does not argue that it was an abuse of discretion for the district court to defer ruling on this motion.

## CONCLUSION

We **AFFIRM**: (1) Defendants' convictions as to Counts 1-9; and (2) the Alis' convictions as to Counts 21-31. We **REVERSE** the Alis' convictions under Counts 11-20. We also **AFFIRM** Defendants' sentences and find no error in the district court's actions with regard to Sameena Ali's motion for substitute counsel.

**AFFIRMED in part and REVERSED in part.**