FILED
United States Court of Appeals
Tenth Circuit

October 20, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MATTHEW AMBROSE BAKER,

    Defendant - Appellant.

Nos. 23-4099 & 24-4019

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:20-CR-00301-DBB-1)**

_____

John T. Carlson, Ridley McGreevy & Winocur (Kevin M. McGreevy, Ridley McGreevy & Winocur, with him on the briefs), Denver, Colorado for Defendant-Appellant.

Trina A. Higgins, U.S. Attorney, Office of the United States Attorney (Tyler L. Murray, Assistant United States Attorney, with her on the brief), Salt Lake City, Utah for Plaintiff-Appellee.

_____

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Matthew Baker owed his brother Shane $445,000. After engaging in a real-estate transaction that earned him more than enough to pay off the debt, Matthew tried to keep the money for himself. He called the escrow agent for the transaction

and lied about how the transaction proceeds should be distributed. He also used the Internet to falsify documents maintained on the Utah Corporation Commission website to make it look as though he managed the entity to which the proceeds were to be distributed.

Matthew was tried and convicted by a jury on two counts of wire fraud based on his scheme to keep Shane from collecting on the debt owed him and to convince the escrow agent to improperly distribute the proceeds of the real-estate transaction. The two counts alleged the same scheme but two different wire transmissions—the telephone call to the escrow agent and the alteration, via the Internet, of the Utah Corporation Commission records.

Matthew challenges his wire-fraud convictions on the following grounds: (1) his alleged misconduct did not deprive Shane or the escrow agent of any interest in property; (2) the district court failed to sua sponte enter into evidence a state-court judgment that Matthew did not offer into evidence at his trial; and (3) the conviction based on the Internet communication is not supported by sufficient evidence because the government failed to prove an interstate wire transmission.

We reject the property argument because Matthew's scheme was an attempt to interfere with Shane's property interest in being paid the debt owed by Matthew and with the escrow agent's property interest in the funds it held pending closing of the real-estate transaction. We also reject the evidentiary argument because it was not properly preserved and the evidence was irrelevant anyway. But we agree with Matthew that the government failed to prove that the charged Internet communication

2

crossed state lines. We therefore reverse the conviction on the Internet count and remand for resentencing, although we reject Matthew's argument that his offense level was miscalculated at the original sentencing.

The indictment against Matthew also included a count charging contempt of court and a count charging possession of ammunition by a convicted felon. He was convicted on both counts at a trial to the court. We reject his challenges to those convictions. We hold that a charge of contempt of court can be initiated by a grand jury. And we follow circuit precedent in holding that the prohibition of ammunition possession by those convicted of nonviolent felonies does not violate the Second Amendment.

Our opinion proceeds in three parts. In Part I we review Matthew's wire-fraud convictions and sentence. In Part II we review his conviction for criminal contempt. And in Part III we review his conviction for being a felon-in-possession.

## I.    WIRE FRAUD

### A.    Background

Over several years Shane loaned his brother Matthew $445,000. Although Matthew repeatedly assured Shane that he would repay the debt, he never did.

In 2017 Matthew and a company of his were charged with health-care fraud, in violation of 18 U.S.C. § 1347, and destruction, alteration, or falsification of records, in violation of 18 U.S.C. § 1519. In July 2019 Matthew met with the Department of Health & Human Services' Office of Inspector General. During the meeting he learned that the United States intended to recover more than $1,000,000 from him.

3

Matthew told Shane that he feared that the government would confiscate his property and asked him if he could start a company in Shane's name and put some of Matthew's property into it. This plan, Matthew said, had "a twofold purpose": it would prevent the government from seizing Matthew's assets and would ensure that Shane "got paid back." R., Vol. VII at 35. Shane agreed to the plan.

On August 23, 2019, Matthew entered into an agreement on behalf of a company called Cap Fund 783, LLC (Cap Fund) to purchase a parcel of land in the Ashton Springs development in Springville, Utah, from Bonnie Hutchings for $373,000. On September 5 Matthew registered Cap Fund with the State of Utah. He listed Shane as both registered agent and manager of Cap Fund on the company's Certificate of Organization. He did not list himself anywhere in the document. Soon thereafter Shane started receiving advertising fliers addressed to Cap Fund. He assumed that Cap Fund was the company that Matthew had described.

In June 2020 Matthew executed an addendum to the Ashton Springs purchase agreement under which Cap Fund agreed to assign its right to purchase Ashton Springs to the real estate holding company of David Simpson and his son (the Simpson Company) in exchange for an assignment fee of $767,000.[1]

Hutchings and Simpson scheduled the closing for June 30. To prepare for the closing, Simpson wired the funds necessary to cover the transaction's closing costs— including the assignment fee payable to Cap Fund—into an escrow account managed

---

[1] At this time Matthew was on home confinement under his sentence for health-care fraud and record falsification.

4

by Old Republic National Title Company (Old Republic). The parties' escrow closing instructions listed Hutchings as seller and the Simpson Company as buyer. They did not mention Matthew.

Shortly before the closing, Simpson met Matthew at Matthew's house. Matthew told Simpson that the assignment fee should be in his name, rather than Cap Fund's. Simpson said that he would "check with the title company and see what . . . we could do[.]" R., Vol. VI at 187. Simpson asked Lynnea Welch, an escrow officer at Old Republic, if the assignment fee could be sent to Matthew. She replied that the assignment fee "had to be sent to Cap Fund's account." *Id.*

On June 30 the closing "happened as normal": Hutchings was paid and the Simpson Company acquired Ashton Springs. *Id.* at 34. After the closing Old Republic e-mailed Matthew stating that it had a check made out to Cap Fund for the assignment fee.

The following day Matthew e-mailed Welch to wire the assignment fee to his personal bank account. She refused. Old Republic's underwriting guidelines forbade distributing "money for an entity to a personal bank account." *Id.* at 42. Also, Welch had noted that Matthew's name did not appear anywhere on the Certificate of Organization for Cap Fund on the Utah official business-entity website.

Welch and Matthew talked by phone. Matthew told Welch that he had "an assignment from Shane Baker at Cap [Fund] to [him] personally" and that Shane "was supposed to ask her . . . if [she] could just send the funds in [Matthew's] name, and apparently, he dropped the ball on that portion." *Id.*, Vol. IV at 23 (internal

quotation marks omitted). Matthew, however, never provided such an assignment to Welch, and Shane testified that he never signed one. Welch told Matthew that Shane needed to sign a statement of authority giving Matthew the power to act for Cap Fund. Matthew replied that he would get the documents to her.

Over a week later, on July 10, 2020, Matthew e-mailed two documents to Old Republic: (1) an assignment dated September 1, 2019 (almost a year before the Ashton Springs closing) to Matthew of Cap Fund's interest in the Hutchings real-estate purchase contract and (2) an operating agreement of Cap Fund dated August 24, 2019, showing himself as the sole member and sole manager. Neither document referenced Shane.

Old Republic, however, already had in its files a copy of a statement of authority on the Utah Secretary of State's website that listed Shane—not Matthew—as manager of Cap Fund. As Scott Morgan, a county manager at Old Republic, put it: the new documents "just didn't jive with what [Old Republic] had." *Id.*, Vol. V at 193.

Welch revisited the Utah business-entity website. She discovered that someone had changed Cap Fund's listed registered agent and manager from Shane to Matthew on July 2, 2020—two days after the Ashton Springs property closing and one day after Welch refused to transfer the assignment fee to Matthew's personal account. Matthew's name was written on the signature line of the "Summary of Online Changes" on the government website. *Id.*, Vol. III at 71. Only someone with Cap Fund's "entity number and a pin or access I.D. number" could make these changes.

6

*Id.*, Vol. VII at 119.

Morgan called Shane. Welch listened in. Shane told Morgan that Matthew owed him a lot of money and had been creating entities on his behalf, but he did not know about Cap Fund. Shane was nevertheless "very interested in knowing about the assignment fee" and "wanted . . . those funds." *Id.*, Vol. V at 196.

Because of the irregularities, Old Republic did not distribute the funds to anyone but filed an interpleader action in state court to determine who should get the money.

In August 2022 a grand jury handed down a superseding indictment charging Matthew with, among other things, two counts of wire fraud (one for the phone call with Old Republic and one for changing Cap Fund's registration information online), in violation of 18 U.S.C. § 1343. A jury convicted Matthew on both counts. The district court sentenced him to 27 months' imprisonment, followed by 36 months' supervised release, and ordered him to pay $445,000 in restitution.

### B.　Discussion

#### 1.　*The scheme to defraud*

The wire-fraud statute, 18 U.S.C. § 1343, prohibits the transmission of information by means of interstate wire communications to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Matthew contends that his convictions under § 1343 must be set aside because the government failed to prove a scheme *for obtaining money or property* from either Shane or the escrow agent. We are not persuaded.

i.    *Shane*

We first address Shane's property interest. Matthew contends that the theory of the prosecution was that Shane had a property interest in the assignment fee paid by the Simpson Company (so the conviction must be set aside because he did not have such an interest). But that is a misreading of the record. The government did not assert at trial, and has not asserted on appeal, that Shane had a property interest specifically in the assignment fee. Rather, Shane had a property interest in the $445,000 debt that Matthew owed him, and Matthew's fraudulent scheme was to prevent Shane from collecting on that debt.

We beg to differ from the contention of the dissent that the government never argued at trial that the purpose of the fraudulent scheme was to prevent Shane's collection of the debt. The theory of the government's case was set forth in the prosecutor's opening statement. It began, "Your Honor, counsel, you don't get to lie to get money." R., Vol. V. at 148. After describing the large amounts of money that Matthew borrowed from Shane, the prosecutor summarized: "[T]here were only two conditions in play. One, was that Matt Baker, the defendant, would pay the interest payments for that line of credit. And the second thing was that Matt Baker would pay it back, pay back the principal." *Id.* at 150. He then noted that Matthew told Shane that he would put some property in Shane's name but Shane "wasn't told which entity or property it would be, and [Matthew] never volunteered that information to Shane." *Id.* at 152. When the prosecutor summarized the sale of property to the Simpson Company, with Matthew getting an extra sum of more than $700,000, what

8

he said was, "The escrow account is funded, Bonnie gets her money, but there is money left over for the transaction. And [Matthew] wanted to make sure he got that money. No matter how he came about it." *Id.* at 154. Describing the lies that Matthew told the escrow company, the prosecutor stated, "Clearly he doesn't want his brother [Shane], who is listed on Cap Fund, to get any of the money that he owes him. He wants all of the money to himself." *Id.* at 155–56. When he got to the call to Shane from the title company, the prosecutor stated: "He's surprised. He doesn't know about this he doesn't – he knows his brother owes him at least $440,000 so this must be the vehicle by which his brother is paying him back." *Id.* at 156. It should be apparent from the above account that the scheme alleged by the government was that Matthew was trying to keep Shane from collecting the debt. But certainly there could be no doubt of this after the prosecutor, as he concluded the opening statement, summarized his theory of the case with the words: "All of this because the defendant, [Matthew], *engaged in a scheme to not pay his brother back the money that he owed him*." *Id.* at 157 (emphasis added).

We do not see how the prosecutor could have been any clearer that the property that was the object of the scheme was the debt owed to Shane by his brother. Simply stated, Matthew did not want to repay the debt and did what he could to try to frustrate collection. Note that the government never told the jury that Shane *owned*

the assignment fee. Whether or not he did was irrelevant to the theory of the prosecution's case.[2]

This theory of the case articulated by the prosecutor was fully consistent with the indictment and the final instructions to the jury. Neither the indictment nor the jury instructions defined the term *property* or specifically designated what the property at issue was. The indictment states that the charge was that Matthew engaged in a scheme "to obtain money and *property*," without any further description of what *property* was obtained or sought. R., Vol. I at 73 (superseding indictment) (emphasis added). And the only mentions of "property" in the instructions after the close of evidence (other than to refer to the Ashton Springs real estate as property) were to say: "A 'scheme to defraud' is conduct intended to or reasonably calculated to deceive persons of ordinary prudence or comprehension, in order to deprive another of money or *property*," *id.* at 253 (emphasis added), and to repeat the above-quoted allegation in the indictment, *see id.* at 254. No jury instruction purported to

---

[2] In support of its contention that the theory of the government case was that Shane owned an interest in the assignment fee, the dissent quotes various statements by the prosecutor later in trial. But the prosecutor was doing nothing more than describing the evidence. For example, it was important for the prosecutor to point out that the net proceeds from the real-estate closing (the assignment fee) were, by contract, to go to Cap Fund. The purpose of mentioning that was not to establish that the assignment fee was the property that was the object of the fraud, but to explain why Matthew had to repeatedly lie to try to get the money to go to him, rather than Cap Fund, so Shane would not know that Matthew had come into more than enough money to pay his debt to Shane. In other words, the arrangement with Cap Fund needed to be explained to show that Matthew's lies were an attempt to frustrate Shane from collecting on the debt.

describe or delimit what "property" Shane was deprived of, nor did either party request such an instruction.

In short, it was clear to the jury that the government's theory of the case was that Matthew lied to frustrate Shane's ability to collect on the debt he was owed. It was left to the jury to determine whether this amounted to a scheme to deprive Shane of property.[3]

---

[3] We add that even if the prosecution had not presented this theory of the case in its opening statement, we would not accept the contention of the dissent that we would have to reject the government's argument on appeal. In contending that the government had to articulate to the jury its theory of what the property was, the dissent relies on a footnote in *McCormick v. United States*, 500 U.S. 257 (1991), and language in *Ciminelli v. United States*, 598 U.S. 306 (2023), even though *McCormick* is not cited in Matthew's appellate briefs and the cites to *Ciminelli* in the Reply Brief are on unrelated propositions. What the footnote in *McCormick* says is that the Supreme Court "has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury." 500 U.S. at 270 n.8. McCormick was a state legislator charged with "extorting property under color of official right" from a group of physicians who favored legislation he supported. *Id.* at 259. The jury was instructed that it could convict McCormick for receiving money under certain circumstances. *See id.* at 261 n.4 (quoting the original instruction), 264–65 (quoting and discussing a supplemental instruction). But the circuit court, after revising the circumstances under which conviction of an elected official for receiving money would be proper, nevertheless affirmed the conviction after determining that the evidence supported the revised circumstances. In other words, the circuit court affirmed the conviction even though the jury instructions would not have required the jury to make the findings on which the appellate court predicated its affirmance. *See id.* at 269–70.

Similarly, in *Ciminelli v. United States*, the Supreme Court rejected the government's suggestion that it affirm a conviction on a "traditional property-fraud theory," when the government had explicitly and repeatedly relied on a right-to-control theory (including invoking the theory to exclude evidence), and the court had so instructed the jury. *See* 598 U.S. at 310–11, 316–17.

There was no such switch of theory here. As noted above, the jury instructions in this case simply required the jury to find that Matthew schemed to deprive his victims of money or property. Neither the indictment nor the jury instructions

Alternatively, Matthew contends that the debt owed Shane was not a property interest for purposes of the wire-fraud statute. On appeal he concedes that the "loans [Shane] made to his brother, never repaid, are an enforceable debt for which a legal remedy exists." Aplt. Br. at 24. But, he contends, there is no remedy under the federal criminal code. We disagree. As we proceed to explain, for purposes of the wire-fraud statute a creditor has a property interest in a debt owed it. And a fraudulent scheme to frustrate collection on that debt is a scheme "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343.

*Pasquantino v. United States*, 544 U.S. 349 (2005), is instructive. Three defendants had been convicted of wire fraud for carrying out a scheme to smuggle liquor into Canada from the United States without paying Canadian excise taxes. *See id.* at 353. Two of the defendants would order liquor over the telephone from discount package stores in Maryland and the third defendant (and others) would drive the liquor across the Canadian border. *See id.* The drivers would avoid the excise

_____

specified or delimited what could be considered as the property targeted by the fraudulent scheme. Our task on appeal is therefore only to determine whether there was a factual basis for the jury to find that some form of property was targeted. Neither Matthew nor the dissent cites any authority to the contrary.

Perhaps the word *property* is too vague for a jury instruction in some cases. The prosecution may want further instructions to be sure that the jury understands that what the victim was deprived of was property. Or the defense may want further instructions to inform the jury that a particular interest of the victim was *not* property. But neither side sought such instructions in this case. And, as instructed, the jury was presented with sufficient evidence to find the requisite property interests here.

taxes by hiding the liquor in their vehicles and failing to declare the goods to Canadian customs officials. *See id.*

The Supreme Court held that the defendants' conduct fell within the "literal terms of the wire fraud statute." *Id.* at 355. It said that "Canada's right to uncollected excise taxes on the liquor [defendants] imported into Canada [was] 'property' in its hands." *Id.* According to the Court, Canada possessed "something of value": an "entitlement to collect money from [the defendants]." *Id.* (internal quotation marks omitted). This "[v]aluable entitlement[]" was "'property' as that term is ordinarily employed." *Id.* at 356. Had the defendants complied with their "legal obligation" to pay the excise taxes to Canada, they would have paid money to Canada. *Id.* Depriving Canada of excise taxes "inflict[ed] an economic injury no less than had they embezzled funds from the Canadian treasury." *Id.* Accordingly, the "object of [the defendants'] scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's 'property.'" *Id.*

The Court "confirm[ed] [its] characterization of Canada's right to excise taxes" by looking to the "common law of fraud." *Id.* It said that "[t]he right to be paid money has long been thought to be a species of property." *Id.* "Consistent with that understanding, fraud at common law included a scheme to deprive a victim of his entitlement to money. For instance, a debtor who concealed his assets when settling debts with his creditors thereby committed common-law fraud." *Id.* All this made sense, the Court said, "given the economic equivalence between money in hand and money legally due." *Id.*

13

In short, *Pasquantino* holds that a scheme that interferes with a victim's right to "collect money" from the defendant deprives that victim of a traditional property right. *Id.* at 355; *see United States v. Sullivan*, 118 F.4th 170, 209 (2d Cir. 2024) ("[C]ontractual rights to payment have long been recognized as valuable property, even if the payment has not yet occurred."); *United States v. Hoffman*, 901 F.3d 523, 536 (5th Cir. 2018) ("Under the common law of fraud, and the even more venerable law of common sense, the right to be paid money has long been thought to be a species of property." (brackets and internal quotation marks omitted)). This holding extends to both private and public victims alike. *See Pasquantino*, 544 U.S. at 356 ("The fact that the victim of the fraud happens to be the government, *rather than a private party*, does not lessen the injury." (emphasis added)); *Hoffman*, 901 F.3d at 536 (same). Despite Matthew's assertion, we see nothing in *Pasquantino* that would require Shane to secure "(1) a court order entitling him to seize the proceeds of the Ashton-Springs closing <u>or</u> (2) a valid security agreement collateralizing his fraternal loans with proceeds derived from Ashton Springs or with Cap Fund's revenues" to qualify as a victim of wire fraud. Aplt. Reply Br. at 8–9. On the contrary, as previously noted, the Supreme Court explicitly stated that *property* within the meaning of the federal fraud statutes includes "[t]he right to be paid money." 544 U.S. 356. The dissent complains that there is no federal appellate case exactly like ours. But given the breadth of the Supreme Court's language, there is no need to start from scratch with every situation in which a victim has a right to be paid money.

It is important to stress that mere failure to pay a debt (absent a fraudulent

14

scheme to frustrate collection) cannot be the basis for a mail-fraud or wire-fraud violation. But the reason that mere failure to pay is not a violation is not because the debt is not property, but because of the absence of the requisite obstruction and intent. A fraudulent scheme to impair the creditor's ability to collect what is due is a well-recognized predicate for the crime. *See, e.g.*, *United States v. Van Doren*, 800 F.3d 998, 999–1000, 1002 & n.5 (8th Cir. 2015) (helping to conceal third-party's "income, assets, and funds" from creditors constituted wire fraud, which served as predicate offense for money-laundering guilty plea); *United States v. Ali*, 620 F.3d 1062, 1064–65, 1068 (9th Cir. 2010) (defendants who schemed to conceal from Microsoft that they were selling discounted educational software to commercial customers, thereby depriving Microsoft of the full payment due for sale of the software, were properly convicted of mail and wire fraud); *United States v. Jones*, 472 F.3d 1136, 1137, 1140 (9th Cir. 2007) (even if defendant acted in good faith when he acquired money from investors to purchase classic cars, he committed wire fraud by keeping the money for himself and lying about how he used the money in an attempt to "avoid returning [the money] to its rightful owners"); *cf. United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989) (pre-dating *Pasquantino* but nevertheless recognizing that defendants committed wire-fraud against a pharmaceutical manufacturer when they obtained pharmaceuticals at discounted costs using fraudulent representations of how they intended to distribute the drugs because the manufacturers "should have received" the money from the sales of those pharmaceuticals).

15

There can be no debate that the evidence at trial supported the charge that Matthew engaged in a scheme to defraud Shane by making false statements to conceal assets through which Shane could have collected the money owed him.[4] The government showed, and Matthew concedes, that Shane had a right to be paid back the $445,000 he had loaned to Matthew over several years.[5] The right to collect this debt was "something of value" to Shane; it was a "[v]aluable entitlement[]" that constitutes "property" for purposes of the wire-fraud statute. *Pasquantino*, 544 U.S. at 355–56 (internal quotation marks omitted). Matthew lied and deceived to keep Shane from learning of the assignment fee and collecting on the debt. He told Welch that Shane had made as assignment to him even though no such assignment ever existed. He submitted an assignment and operating agreement for Cap Fund that did not mention Shane and contradicted what Old Republic already had on file. When

---

[4] The dissent expresses concern that "[a]fter today's decision, a defendant commits wire fraud if he receives money *unrelated* to his debt and fails to inform the person who lent him money." Partial Dissent at 17–18. The concern is unwarranted. Nothing in this opinion imposes a per se duty of a debtor to inform creditors of the receipt of money or property. What happened here, however, is that the debtor (Matthew) *lied* to try to keep the creditor (Shane) from learning about the receipt of funds that could have paid the debt. There may also be circumstances in which the debtor has a duty to disclose and the failure to disclose constitutes fraud. But we need not pursue that issue to resolve this appeal.

[5] The dissent asserts that "Shane didn't have a judgment or any other legally enforceable right against Matthew for the $445,000 loan," and appends a footnote saying that Utah law often treats "transfers of money among close family members . . . as gifts." Partial Dissent at 18. These statements are perplexing. The defense never spoke of the transfers as gifts, and its appellate briefs repeatedly refer to the transfers as loans and concede that the loans were legally enforceable. *See, e.g.*, Aplt. Br. at 24 ("The loans he made to his brother, never repaid, are an enforceable debt for which a legal remedy exists.").

Welch investigated further, she discovered that someone with access to Cap Fund's online registration information had changed the entity's listed registered agent and manager from Shane to Matthew on the Utah business-entity website. This change was made just one day after Welch refused to send the assignment to Matthew.

ii.    *Old Republic*

Matthew also argues that he did not attempt to deprive Old Republic of any property. We disagree. As the escrow agent for the Ashton Springs transaction, Old Republic had a property interest in the escrowed funds. Matthew tried to trick (defraud) Old Republic into sending those funds to the wrong person, just as a common fraudster would try to trick a victim into parting with its money.

The proposition that Old Republic had a property interest follows from *Shaw v. United States*, 580 U.S. 63 (2016). Shaw had obtained account numbers of a deposit holder at a bank, enabling him to transfer funds from the depositor's account to accounts at other financial institutions used by Shaw. *See id.* at 65. He was convicted of violating 18 U.S.C. § 1344(1), which authorizes criminal punishment for "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution." Shaw argued that the statute "requires an intent to wrong a victim bank . . . *in its property rights*," but that his scheme was "designed to obtain only a bank *customer*'s property, not a bank's *own* property." *Id.* at 66 (internal quotation marks omitted).

The Supreme Court rejected the argument, holding that the bank *did* have property rights in the funds held in the customer's bank account. *See id*. It explained

17

that banks may have a property right in two respects. To begin with, a bank "ordinarily becomes the owner of the funds and consequently has the right to use the funds as a source of loans that help the bank earn profits (though the customer retains the right, for example, to withdraw funds)." *Id*. But even if "the contract between the customer and the bank provides that the customer retains ownership of the funds and the bank merely assumes possession," the bank, "as bailee, . . . can assert the right to possess the deposited funds against all the world but for the bailor (or, say, the bailor's authorized agent)." *Id*. This right of possession, the Court held, is "a property right" for purposes of § 1344. *Id*. As a result, "a scheme fraudulently to obtain funds from a bank depositor's account normally is also a scheme fraudulently to obtain property from a 'financial institution,' at least where, as here, the defendant knew that the bank held the deposits, the funds obtained came from the deposit account, and the defendant misled the bank in order to obtain those funds." *Id.* at 67; *see United States v. Capps*, 977 F.3d 250, 259 (3d Cir. 2020) (holding that an investment company "had a property interest in the funds in its possession," despite its customers' property rights in the same funds, because it held "its account holders' funds in a fashion similar enough to a bank to warrant following the reasoning in *Shaw*"); *cf. Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149–150 (2021) (explaining that "[t]he right to exclude is 'one of the most treasured' rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property" (internal quotation marks omitted)).

Although *Shaw* was interpreting the bank-fraud statute, rather than the wire-

fraud statute at issue here, we can think of no reason why the notion of *property* in the two statutes would be materially different. As we observed several decades ago, the bank-fraud statute "was modeled after the mail and wire fraud statutes (18 U.S.C. §§ 1341, 1344)," which "contain[] virtually the same language." *United States v. Young*, 952 F.2d 1252, 1255 (10th Cir. 1991).

Old Republic had a property interest in the escrowed funds because it had both property rights of banks described in *Shaw* (either of which would suffice). First, it could use the funds to obtain exclusive advantages. Paragraph XXI of the escrow instructions permitted it to obtain "collateral benefits" from escrowed funds deposited in a bank, such as "bank services, accommodations, interest, loans or other business transactions from the [bank]" and it had "no obligation to account to parties to this escrow for the value of any such collateral benefits." R., Vol. III at 61.[6]

---

[6] Paragraph XXI provides in full:

Old Republic National Title Insurance shall place all funds received in escrow into a federally insured depository account specifically designated as a trust account. Any funds in an amount that exceeds $250,000.00 may not qualify for FDIC insurance. Old Republic National Title Insurance shall not be responsible for any loss of funds occurring as a result or failure of the institution in which funds have been deposited so long as Old Republic National Title Insurance complies with the foregoing provisions. Old Republic National Title Insurance may receive certain financial benefits such as an array of bank services accommodations interest loans or other business transactions from the depositories collateral benefits. All collateral benefits shall accrue to the sole benefit of Old Republic National Title Insurance and Old Republic National Title Insurance shall have no obligation to account to parties to this escrow for the value of any such collateral benefits. Earnings on funds held in escrow shall be owned by and periodically disbursed to Old Republic National

Second, Old Republic had "the right to possess the deposited funds against all the world" except the parties to the escrow agreement. *Shaw*, 580 U.S. at 66. Indeed, in some respects it had greater rights to possession than either of the parties. Paragraph XXI of the escrow instructions required Old Republic to "place all funds received in escrow into a federally insured depository account specifically designated as a trust account" outside the control of Hutchings and Simpson. R., Vol. III at 61; *see id.*, Vol. II at 59 ("Buyer and Seller hereby acknowledge that Old Republic National Title Insurance is not the agent of any single party."); Restatement (Third) of Agency § 8.09 cmt. d. (A.L.I. 2006) ("An escrow arrangement places the escrowed deed or other property beyond the control of parties to a transaction for a specified time and determines when the holder may properly make delivery."). After the assignment fee was placed in escrow, neither Hutchings nor Simpson could obtain possession of the assignment fee other than under the terms of the agreement. *See* R., Vol. III at 66 ("If any conflicting demands are made on Old Republic National Title Insurance, it may, at its sole discretion, hold monies . . . received from any party except Buyer's Lender. Old Republic National Title Insurance shall retain such items until . . . receipt of mutual written instruction from Buyer and Seller.")[7]; Utah Code

---

Title Insurance as additional consideration for services actually performed by Old Republic National Title Insurance.

R., Vol. III at 61.

[7] Paragraph XXVI provides in full:

If any conflicting demands are made on Old Republic National Title

Ann. § 7-22-108(1) ("Funds may be paid from trust accounts only in accordance with the terms and conditions of the escrow agreement.").

Hence, Matthew's scheme to "fraudulently . . . obtain" the escrowed funds from Old Republic was "a scheme fraudulently to obtain property from" Old Republic. *Shaw*, 580 U.S. at 67.

Matthew's reliance on dictum in a footnote in *In re First Capital Mortgage Loan Corp.*, 917 F.2d 424, 428 n.3 (10th Cir. 1990) (en banc), requires only a brief response. The footnote states that "an escrow holder is an agent with neither legal nor equitable title to the funds it holds in escrow." Aplt. Br. at 36 (internal quotation marks omitted). Suffice it to say that to the extent that this comment can be read to suggest that an escrow agent has no property interest in escrowed funds for the purpose of federal fraud statutes (a debatable reading to begin with), that suggestion was undermined by the Supreme Court's later decision in *Shaw*.

A final point on this issue. The dissent contends that the government's theory at trial was that Old Republic's property interest at issue was only "the avoidance of

---

Company, it may, at its sole discretion, hold monies, documents, and things of value received from any party except Buyer's Lender. Old Republic National Title Insurance shall retain such items until (1) receipt of mutual written instruction from Buyer and Seller or (2) until a civil action between Buyer and Seller shall have been finally concluded in a Court of competent jurisdiction or (3) in the alternative Old Republic National Title Insurance may at its sole discretion commence civil action to interplead or interplead in any existing civil action any documents monies or other things of value received by Old Republic National Title Insurance.

R., Vol. III at 66.

being sued." Partial Dissent at 10. But the prosecutor's reference to that liability was not to say that this avoidance was its property interest. The prosecutor was talking about how Matthew attempted to defraud the escrow company. Matthew tried to get the escrow company to do something improper, something for which it would incur liability. The government's presentation on the property interest was the testimony by the escrow agent and related documents concerning the powers and duties of escrow agents. From that testimony, the jury could properly determine that the escrow agent had a property interest in the funds under its control and that Matthew was trying to interfere with that interest by providing false information. We note that in district court Matthew never challenged Old Republic's having a property interest in the funds under its control and never asked the trial judge to instruct the jury on the law of property interests.

### 2.   *Evidentiary challenge*

Matthew contends that while the criminal proceedings were pending, he obtained a state-court judgment (the Interpleader Judgment) holding that he—not Shane—was entitled to the assignment fee. He complains that the judgment was not admitted as evidence at his criminal trial. He argues that the Interpleader Judgment was admissible as a verbal act affecting the legal rights of the parties or a statement affecting an interest in property under Federal Rule of Evidence 803(15). The government responds that this argument is unpreserved and fails on plain-error review. We agree with the government.

Matthew's claim that the judgment should have been admitted into evidence

22

was not preserved. The government filed a pretrial motion to exclude the judgment. At the pretrial conference the district court expressed doubt that it was admissible, but it explicitly declined to make a definitive ruling. In fact, it encouraged Matthew to re-raise the admissibility question at trial by moving to admit the evidence. After the hearing the court entered an order "reserv[ing] ruling" on the government's motion in limine. R., Vol. I at 234.

Matthew failed, however, to move to admit the evidence at trial. This failure amounts to invited error. After all, what better way to invite the court to not admit a piece of evidence than to refrain from offering it? To invite an error is to waive it so that it is not reviewable on appeal. *See United States v. Teerlink*, No. 23-4095, 2025 WL 1739711, at *3 (10th Cir. 2025) (published) ("Our invited-error doctrine . . . prevents a party who induces an erroneous ruling from being able to have it set aside on appeal. Waiver bars a defendant from appealing an invited error." (brackets, citations, and internal quotation marks omitted)).

At the most, we would review only for plain error. *See United States v. Harry*, 816 F.3d 1268, 1282 (10th Cir. 2016) (if the defendant did not make an adequate proffer of evidence, our review is limited to plain error). To obtain relief on plain-error review, Matthew must show that: "(1) the district court committed an error, (2) the error is clear at the time of the appeal, (3) the error affect[ed] [his] substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1283 (internal quotation marks omitted). "[A]n error is plain only when it is contrary to well-settled law—that is, it either runs afoul of the

23

Supreme Court's precedents or our own." *United States v. Jimenez*, 61 F.4th 1281, 1289 (10th Cir. 2023) (internal quotation marks omitted). "[A] lengthy analysis [of these factors] is generally unnecessary when an appellant challenging the exclusion of evidence failed to make an adequate proffer of proof." *Harry*, 816 F.3d at 1283.

This case is no exception. Matthew fails to show an error—let alone a clear one. It is not error for a judge to fail to sua sponte admit evidence that has not been offered by a party. *See, e.g.*, *United States v. McFadden*, 116 F.4th 1069, 1094 (10th Cir. 2024) ("The district court is capable but not clairvoyant."); *United States v. Faunce*, 66 F.4th 1244, 1254 (10th Cir. 2023) ("We cannot fault the district court for failing to consider data that hadn't been presented."); *United States v. Rodriguez*, 858 F.3d 960, 963 (5th Cir. 2017) ("The district court could not have abused its discretion by failing to consider facts not presented."). And even assuming an error, Matthew fails to show that error was *clear*. He cites no authority, and we know of none, holding that a district court erred by not sua sponte presenting to the jury evidence not offered by either party.

In addition, we think it far from clear that the judgment would have been admissible at trial if it had in fact been proffered. For one thing, it was not clearly relevant. Even if the judgment established that Matthew was personally entitled to the assignment fee, he still owed Shane a huge amount of money and the fee could have been the asset used to pay that debt. The fraud charged by the government was Matthew's concealment of that asset from Shane to impair his ability to collect what was owed him. At the least, the district court could have reasonably excluded the

judgment because it would have confused the issues before the jury. Exclusion on that ground would not have been obvious error. Relief is therefore unwarranted on Matthew's evidentiary issue.

Matthew attempts to circumvent these problems by arguing that we should take judicial notice of the Interpleader Judgment. We decline the invitation. Even undisputed evidence can be irrelevant. *See Cravens v. Smith*, 610 F.3d 1019, 1029 (8th Cir. 2010) ("[A] court may properly decline to take judicial notice of documents that are irrelevant to the resolution of a case.").

### 3.    *Interstate commerce*

Matthew argues that the government did not introduce sufficient evidence at trial to prove that the wire-transmission underlying Count II—Matthew's online modifications to the Utah business-entity website—traveled in interstate commerce. The government says that it did. We agree with Matthew.

Because Matthew did not raise this issue at trial, both parties agree that our review is for plain error. *See United States v. Otuonye*, 995 F.3d 1191, 1210 (10th Cir. 2021) ("An insufficient evidence claim not raised or preserved below is reviewed for plain error. . . ."). Our review, however, "in this context differs little from our de novo review of a properly preserved sufficiency claim because a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements." *Id.* at 1210 (internal quotation marks omitted). We proceed accordingly.

We start "with a truism: the particular wording of [an] interstate-commerce

element of a statute establishes what the government must prove." *United States v. Haas*, 37 F.4th 1256, 1264 (7th Cir. 2022). The wire-fraud statute uses the phrase *in interstate commerce*. *See* 18 U.S.C. § 1343 ("Whoever . . . transmits or causes to be transmitted by means of wire, radio, or television communication *in interstate* or foreign *commerce*, any writings, signs, signals, pictures, or sounds for the purpose of executing" a scheme to defraud shall be punished (emphasis added)). As we have interpreted this language, the government must prove that the charged "communications actually cross[ed] state lines." *United States v. Kieffer*, 681 F.3d 1143, 1153 (10th Cir. 2012) (internal quotation marks omitted); *see United States v. O'Donovan*, 126 F.4th 17, 34 (1st Cir. 2025) ("Satisfaction of the interstate-commerce element [of § 1343] requires proof that the charged communications actually crossed a state or national border." (brackets, ellipsis, and internal quotation marks omitted)); *Haas*, 37 F.4th at 1264 ("Statutes that contain language such as 'in interstate commerce' require proof that state lines were crossed . . . .").

We have held that an "individual's use of the internet, 'standing alone,' does not establish an interstate transmission." *Kieffer*, 681 F.3d at 1155. "This is because the origin and host servers, whether one and the same or separate, *might* be located in the same state as the computer used to access the website." *Id*. We therefore do not "assume that Internet use automatically equates with a movement across state lines." *United States v. Schaefer*, 501 F.3d 1197, 1205 (10th Cir. 2007), *overruled in part on other grounds by United States v. Sturm*, 672 F.3d 891 (10th Cir. 2012) (en banc).

Two cases help flesh out this court's analytic approach. In *United States v.*

26

*Schaefer*, 501 F.3d at 1198, the government charged the defendant with one count of receiving child pornography, *see* 18 U.S.C. § 2252(a)(2), and one count of possessing child pornography, *see* 18 U.S.C. § 2252(a)(4)(B). Both statutes required the images be mailed, shipped, or transported *in interstate commerce*. *See Schaefer*, 501 F.3d at 1200. To prove this element the government presented evidence that: (1) the defendant visited Internet sites that sold child pornography and downloaded child pornography to his computer; (2) the CDs found in his possession could accept downloaded materials; and (3) the CDs contained an image of a young girl and foreign-language movie clips of child pornography that were embedded with Internet website addresses. *See id.* at 1206.

We held that such evidence failed to show that the charged images traveled across state lines. *See id.* at 1206–07. We recognized that the government had a variety of "conceivable paths of proof to establish the movement of [the charged communications] across state lines." *Id.* at 1205. It could have, for example, offered evidence that "the server locations of the websites that [the defendant] searched" were in a different state from the "server location of [the defendant's] Internet service provider." *Id*. What the government could not do, however, was simply prove that "the defendant used the Internet," *United States v. Vigil*, 523 F.3d 1258, 1266 (10th Cir. 2008) (summarizing *Schaefer*), and hope that a court would "assume that Internet use automatically equates with a movement across state lines," *Schaefer*, 501 F.3d at 1205. To accept such a position, we said, would create an "Internet exception" to all statutes that use *in interstate commerce* as their jurisdictional

element and undermine Congress's deliberate choice to use more "limiting jurisdictional language" in certain statutes. *Id.* at 1205 (internal quotation marks omitted).

In contrast, in *Kieffer*, 681 F.3d at 1146, the government charged the defendant with wire fraud after he used an Internet website (boplaw.com) to promote his unauthorized practice of law and to bilk the brother of a "client" (the victim) out of several thousand dollars. To prove that wire transmissions traveled in interstate commerce, the government showed that (1) the "[d]efendant was in control of the content of" boplaw.com; (2) the defendant "registered the domain name boplaw.com with Name Secure, a subsidiary of Network Solutions"; (3) "Network Solutions operated host servers in Virginia that permitted a domain name registrant's website to be viewed on the internet once the registrant associated files with" the domain name (that is, uploaded content); and (4) the victim and the defendant's cocounsel "accessed boplaw.com from computers in Tennessee and Colorado, respectively." *Id.* at 1153–54.

We held that such evidence *did* show that the charged communications traveled across state lines. *See id.* at 1154. A reasonable jury, we determined, could infer that the defendant distributed content "across state lines" because the two defrauded persons "accessed the content of boplaw.com from computers in different states." *Id*. We explained that "where computers in multiple states access the same website," "the content of the website contained on the origin server must transmit across state lines." *Id.* at 1155. We distinguished *Schaefer*, reiterating the "narrow

28

proposition for which *Schaefer* still stands, namely that one individual's use of the internet, standing alone, does not establish an interstate transmission." *Id.* (internal quotation marks omitted).

Here, the government failed to provide sufficient evidence that the charged wire-communications actually traveled across state lines. It provided evidence that (1) Matthew logged onto the Utah business-entity website and changed the manager of Cap Fund from Shane to himself; (2) Old Republic employees in Utah looked at the website twice in their dealings with Matthew; and (3) the Utah business-entity website is publicly available across state lines and could be accessed from anywhere in the United States and even internationally.

This evidence falls short of the mark. The first two pieces of evidence do not show *interstate* transmissions; if anything, they show the opposite: *intrastate* transmissions. After all, Matthew and Old Republic accessed the *same* website in the *same* state. The final piece of evidence—that the Utah business-entity website is publicly available and that changes made to it are broadcast and available across state lines—also does not show an *interstate* transmission pertinent to Matthew's scheme. This evidence suggests nothing more than that at some point someone almost anywhere could have accessed the Utah business entity website and discovered the modifications to Cap Fund's registration information. But this does not show that when Matthew modified the information on the website, *his* communication *actually* traveled outside Utah. The government's evidence hardly excludes the possibility that the servers used for the communications relevant to this charge were "located in the

same state as the computers used to access the website." *Kieffer*, 681 F.3d at 1155; *see Schaefer*, 501 F.3d at 1201 ("We recognize in many, if not most, situations the use of the Internet will involve the movement of communications or materials between states. But this fact does not suspend the need for evidence of this interstate movement." (footnote omitted)). The government—not the court—must connect the dots between a defendant's use of the Internet and interstate movement.[8]

The conviction of Matthew based on his communication to the business-entity website was "clear and obvious error." *Id.* at 1207. As we noted in *Schaefer*, "it will be the extraordinarily rare case where error that is predicated upon the insufficiency of the evidence will not adversely affect a defendant's substantial rights and seriously affect the fairness, or integrity, or public reputation of judicial proceedings." *Id*. This is not one of those cases.

We affirm Matthew's conviction on Count I. We reverse his conviction on Count II.

### 4. *Sentencing*

Matthew next argues that if we find that Shane was a victim of wire fraud (as we do), he must be resentenced because the loss calculations under U.S.S.G. § 2B1.1

---

[8] The government has not "asked us to take judicial notice" of the "likely interstate and international architecture and operation of the world web." *Schaefer*, 501 F.3d at 1201 n.8. We therefore abstain from "mak[ing] broad assumptions about the Internet." *Id.*; *see id.* at 1208 (Tymkovich, J., concurring) (suggesting that we may take judicial notice of the "ubiquitous interstate nature of the Internet" in an appropriate case). We also note that the government asks us to overrule *Schaefer*; but that action must come from the Supreme Court or an en banc decision of this court.

were too high. He grounds this argument on the proposition that Matthew could be guilty only if Shane had a property interest in the assignment fee. If that were the case, the argument goes, then the assignment fee must have been collateral for the debt Matthew owed Shane, and such collateral would offset Shane's loss, substantially reducing his offense level.[9]

The premise of this argument is incorrect. Matthew's guilt is not based on the ground that Shane had a property interest in the assignment fee. The property interest supporting the verdict is Shane's interest as a creditor in the debt owed by Matthew. Matthew violated the statute by engaging in a scheme to impair Shane's ability to collect on the debt. Thus, no recalculation of the amount of loss is necessary.

## II.    CRIMINAL CONTEMPT

We turn to Count III. While on pretrial release after the original indictment was handed down, Matthew transferred several assets worth over $1,500 without prior approval from the probation office, violating the conditions of his release. In response the government obtained a superseding indictment against Matthew

---

[9] Matthew started at a base offense level of 7 for fraud. *See* U.S.S.G. § 2B1.1(a)(1) & cmt n.2(A) (2021). The district court increased his base offense level by 12 after it determined that the actual and intended "loss" in the case was $445,000. *See* U.S.S.G. § 2B1.1(b)(1)(G), (H) (2021) (stating that if the "loss" is between $250,000 and $550,000, increase the offense level by 12). But that loss level can be reduced if there was collateral for the debt. Under U.S.S.G. § 2B1.1 cmt. n.3(E)(ii) (2021), "In a case involving collateral pledged or otherwise provided by the defendant," the loss amount shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

charging him with criminal contempt under 18 U.S.C. § 401. The district court held a bench trial and found Matthew guilty. It sentenced him to three months' imprisonment, to be served consecutively to his wire-fraud sentences.

On appeal Matthew contends that contempt proceedings under 18 U.S.C. § 401 cannot be initiated by a prosecutor but only by a court. He points to the title and text of 18 U.S.C. § 401. The title is "Power of court," and it provides: "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, . . . as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." He argues that this grant of authority to courts implies that "prosecutors housed in the executive branch" have no such power. Aplt. Br. at 55.

We are not persuaded. The power granted by § 401 is the power to punish, not the power to prosecute. Neither the title nor the text of § 401 speak to this latter authority. And neither explicitly prohibits federal prosecutors from prosecuting criminal contempt through grand-jury indictment.

As for the power to initiate a charge, United States attorneys have a statutory duty to "prosecute for all offenses against the United States." 28 U.S.C. § 547(1). Criminal contempt is one such offense. *See Pendergast v. United States*, 317 U.S. 412, 416–17 (1943) (holding that criminal contempt is an offense against the United States for purposes of the general statute of limitations for noncapital offenses); *Ex Parte Grossman*, 267 U.S. 87, 115 (1925) ("Nothing in the ordinary meaning of the words 'offenses against the United States' excludes criminal contempts. That which

violates the dignity and authority of federal courts such as an intentional effort to defeat their decrees justifying punishment violates a law of the United States and so must be an offense against the United States." (citation omitted)); *United States v. Williams*, 622 F.2d 830, 839 (5th Cir. 1980) ("We conclude that the willful breach of an order of court restricting travel . . . constitutes contempt under 18 U.S.C. § 401(3) [granting courts the power to punish contempt]. Such a violation is an 'offense against the United States' as that term is used in 21 U.S.C. § 878(3) [providing certain powers of warrantless arrest for offenses against the United States]."); *cf. Bloom v. Illinois*, 391 U.S. 194, 201 (1968) ("Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both.").

It follows that United States attorneys can prosecute criminal contempt. When they do, they may proceed through grand-jury indictment. *See* Fed. R. Crim. P. 7 advisory committee's note to 2002 amendments ("While indictment is not a required method of bringing felony criminal contempt charges, . . . it is a permissible one."); *United States v. Mohsen*, 587 F.3d 1028, 1032 (9th Cir. 2009) (per curiam) ("Both the trial court and the grand jury have power to bring contempt proceedings under . . . 18 U.S.C. § 401."); *Williams*, 622 F.2d at 838 ("Criminal contempt charges may be initiated by indictment" without "any prior or precipitating action by the court."); *United States v. Morales*, 566 F.2d 402, 404 (2d Cir. 1977) ("Many cases have tacitly or explicitly recognized the power of grand juries to hand down indictments charging criminal contempt.") (collecting cases); Sara Sun Beale et al., *Grand Jury Law &*

33

*Practice* § 11:20 at 568 (2d ed. 2024) ("It is well settled that criminal contempts, both in the federal system and in state jurisdictions, need not proceed on an indictment, although an indictment is a permissible way to institute contempt proceedings." (footnotes omitted)); *cf. Yates v. United States*, 316 F.2d 718, 723 (10th Cir. 1963) ("Under Section 401, it is not necessary to initiate criminal contempt proceedings by indictment, information or presentment"; such proceedings can be brought by "petition, affidavit[,] or other showing.").

We affirm Matthew's conviction on Count III.

## III.   FELON IN POSSESSION

Finally, Matthew challenges his conviction on Count IV. In March 2022 probation officers conducted a search of his residence. They found some 40 rounds of .38 special ammunition in a drawer in his master bedroom and 37 rounds of 9 mm ammunition in a duffle bag in a closet of a basement room that Matthew unlocked at the officers' request. After a bench trial the district court found Matthew guilty of possessing ammunition as a felon in violation of 18 U.S.C. § 922(g)(1). It sentenced him to nine months and one day of imprisonment, to run consecutively to his wire-fraud sentences.

On appeal Matthew argues that § 922(g)(1) violates the Second Amendment on its face and as applied to him. As Matthew acknowledges, however, this court has held otherwise. *See Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025) (holding that § 922(g)(1) does not violate the Second Amendment when applied to "nonviolent offenders"). We therefore reject this argument and affirm Matthew's

conviction on Count IV.

## IV.    CONCLUSION

We **AFFIRM** the convictions on counts I, III, and IV; **REVERSE** the district court's judgment on Count II; and **REMAND** for resentencing.

23-4099, 24-4019, *United States v. Baker*
**PHILLIPS**, J., concurring and dissenting.

I join the majority opinion except for its affirmance of Count One. Maj. Op. at 7–22, 30, 35. For that count, the majority affirms Matthew's wire-fraud conviction based on wire-fraud theories that were not presented to the jury. Yet we "are not permitted to affirm convictions on any theory [we] please simply because the facts necessary to support the theory were presented to the jury." *Ciminelli v. United States*, 598 U.S. 306, 317 (2023) (quoting *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991)). Further, I dissent from the expansive wire-fraud theory the majority applies to one of Matthew's purported victims, Shane Baker.

I.    **Factual Background**

A.    **The Loans**

This appeal arises from several loans[1] Shane made to his brother, Matthew. In 2015 or 2016, Shane told Matthew that he had acquired from a bank a $250,000 line of credit to invest in real estate. Matthew asked if he could borrow against that line of credit. Shane agreed, and Matthew typed and signed some sort of note saying he'd pay Shane back in six months.[2] After

---

[1] I use the word "loan" to match the convention used by the parties and the majority. But as I discuss below, I think the record reveals that those transfers may be closer to gifts than enforceable loans.

[2] The note is not in the appellate record.

Matthew signed the note, Shane had the bank increase the line of credit to $350,000.

The bank required that any sums borrowed against the $350,000 line of credit be repaid within a year of the borrowing. Matthew paid Shane nothing on the loan within six months or one year. Believing that Matthew would never pay him back, Shane repaid the bank himself in the next three and a half years.

Though Matthew never repaid Shane for that loan, Matthew still asked Shane to borrow another $60,000 because "he was in a tight spot." App. vol. VII, at 32. He promised Shane he'd repay him once he closed on a lucrative real-estate deal that he had in the works. Shane agreed. After that, Shane lent Matthew money twice more. One loan was for $30,000 and the other for $5,000. Unlike the first loan, all three of those loans were made without any agreement on when or how Matthew would repay Shane.

All told, Shane lent Matthew money four times, totaling $445,000. He charged Matthew no interest. And apart from the note for the $250,000 loan, the record reveals no written or enforceable oral agreement for repayment. Instead, Shane chose to rely on his brother's word of honor about repaying the loans. That proved to be a poor choice because Matthew never paid him back.

Despite that, by 2020—nearly five years after the first loan—Shane had not sued Matthew to collect on those loans.[3]

## B.    The Real-Estate Transaction

In September 2019, Matthew was sentenced on federal health-care-fraud charges in a prosecution unrelated to this one. He learned that the government sought over a million dollars in restitution. At the same time, Shane was repeatedly asking Matthew for repayment too. To solve both problems, Matthew hatched a new plan. He would create an LLC, move his own property into the LLC, and put the LLC's assets in Shane's name. With that LLC, he was trying to shield his properties from the government and repay Shane. With no specific knowledge of how that plan would be executed, Shane agreed.

After Shane agreed to that plan, Matthew agreed to pay a landowner $373,000 for property known as the Ashton Springs property. After he signed the real-estate contract, he established Cap Fund 783, LLC, and listed Shane as its manager, but not its member. Ten months later, not having purchased the property yet, Matthew assigned his right to purchase to a developer for $767,000.

---

[3] After Matthew's activities in this case came to light, Shane sued Matthew in state court to collect on the loans.

3

## C.    The Wire-Fraud Conduct

The developer wired the $767,000 to an escrow account managed by Old Republic Title. After that, Matthew directed Old Republic to wire the proceeds to his personal bank account. But in its review, Old Republic saw that the assignment fee was made payable to Cap Fund, not Matthew. Investigating further, the escrow agent obtained a copy of Cap Fund's publicly available Certificate of Organization, which listed Shane as Cap Fund's manager and did not mention Matthew. In those circumstances, the escrow agent declined to distribute the fee to Matthew's personal bank account.

In what became a heated telephone conversation, the agent explained to Matthew that Old Republic would not wire him the assignment fee, because the fee was payable to Cap Fund, and Shane was Cap Fund's manager. Matthew responded that Shane had assigned the fee to him. He now concedes that his statement was a lie.

After the call, Matthew removed Shane's name as Cap Fund's manager and replaced Shane's name with his own. Old Republic obtained and reviewed the new Certificate of Organization after the call and saw that Matthew had removed Shane's name and replaced it with his own. So it called Shane to figure out what was going on. Shane told Old Republic that he did not know about Cap Fund and that Matthew owed him a lot of money. In this fraught setting, Old Republic filed an interpleader action for the assignment fee in Utah state court. About a month after that, Matthew was indicted in this case.

4

## II.    Legal Background

The wire-fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]" 18 U.S.C. § 1343. The object of the fraud "must be property in the hands of the victim." *Cleveland v. United States*, 531 U.S. 12, 15 (2000);[4] *Shaw v. United States*, 580 U.S. 63, 68–69 (2016) (same). That includes money *legally due* to the victim. *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (emphasis added) (noting that common-law fraud included schemes by a "debtor who concealed his assets when settling debts with his creditors" because of "the economic equivalence between money in hand and money legally due"). In other words, "[i]t does not suffice . . . that the object of the fraud *may* become property in the recipient's hands." *Cleveland*, 531 U.S. at 15 (emphasis added).

It is also not sufficient if the victim's property is "only an incidental byproduct of the scheme." *Kelly v. United States*, 590 U.S. 391, 402 (2020). The victim's property must be the *object* of the scheme, rather than "play . . . some bit part in [the] scheme." *Id.*

---

[4] "Although *Cleveland* involved the mail fraud statute, 18 U.S.C. § 1341, we have construed identical language in the wire and mail fraud statutes *in pari materia*." *Ciminelli v. United States*, 589 U.S. 306, 312 n.2 (2023).

### III.    The Majority's Count-One Analysis

At trial, the government argued that Matthew had defrauded two victims—Shane and Old Republic—of their separate property rights. In my view, the majority does not address the merits of the government's actual wire-fraud theories, presumably because the government has abandoned them on appeal. Instead, the majority affirms Matthew's convictions based on different wire-fraud theories raised for the first time on appeal.

I disagree with the majority's approach for three reasons: First, by affirming a conviction on wire-fraud theories not presented to the jury, the majority has assumed the role of the jury. Doing so violates Matthew's constitutional right to have a jury determine his criminal liability in the first instance. Second, the newly expansive wire-fraud theory that the majority applies to Shane contradicts our caselaw and significantly expands the reach of the wire-fraud statute. And even if that expansive wire-fraud theory was in fact preserved and legally viable, I would see insufficient evidence to support a conviction on that theory. I address each issue in turn.

#### A.    The majority affirms Matthew's conviction based on wire-fraud theories not presented to the jury.

Though we may affirm on any basis supported by the record in a *civil* case, *see A.M. v. Holmes*, 830 F.3d 1123, 1157 (10th Cir. 2016), we may not do so in affirming a criminal conviction, *McCormick*, 500 U.S. at 270 n.8 ("Appellate courts are not permitted to affirm convictions on any theory they

6

please simply because the facts necessary to support the theory were presented to the jury."). That's so because "in a criminal case[,] a defendant is constitutionally entitled to have the issue of criminal liability determined by a jury in the first instance." *McCormick*, 500 U.S. at 270 n.8; *accord Ciminelli*, 598 U.S. at 316–17 (noting that we assume the function of a jury when we affirm a criminal conviction based on "cherry-pick[ed] facts presented to a jury charged on [one theory] and apply them to the elements of a *different* wire fraud theory in the first instance"). When a court of appeals affirms a conviction "on legal and factual theories never tried before the jury" the Supreme Court has held that "the judgment must be reversed . . . for that reason alone." *McCormick*, 500 U.S. at 270 n.8. Despite that precedent, the majority erroneously affirms Matthew's convictions based on wire-fraud theories for Shane and Old Republic that were not presented to the jury.

### 1. Shane

The majority says that the government argued to the jury that Shane had "a property interest in the $445,000 debt that Matthew owed him." Maj. Op. at 8. And it contends that the "fraudulent scheme was to prevent Shane from collecting on that debt." *Id.* Without addressing any evidence presented to the jury, or even citing the record, the majority—in my view mistakenly—states that "[t]he government did not assert at trial, and has not asserted on appeal, that Shane had a property interest specifically in the assignment fee." *Id.* That reading belies the record.

7

In fact, the government set out to prove that Shane was entitled to the assignment fee as Cap Fund's manager. Throughout the trial, the government introduced evidence that Old Republic sought to identify Cap Fund's manager "[t]o find out who had the authority to . . . mak[e] decisions on where money goes for [the] company." App. vol. VI, at 41. It put on evidence that Old Republic had asked Shane if he approved of Old Republic's sending the assignment fee to Matthew when Shane's "*name is on the paperwork*." App. vol. VII, at 51 (emphasis added). And it elicited testimony from Old Republic that Shane "had the authority to tell [Old Republic] where to send [the] money" because he was the manager of Cap Fund. App. vol. VI, at 56.

At the close of evidence, the government opposed Matthew's motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29. It contended that sufficient evidence could sustain a conviction, arguing:

- That the "LLC was entitled to the assignment fee" and that "at the time of closing, [the LLC] was registered in the name of Shane Baker and he was the sole listed manager and member." App. vol. VII, at 127.

- That Matthew's name was not connected with the LLC's registration and that "Shane . . . [was] solely listed as the only principal on [the registration] document." *Id.*

- That Matthew replaced Shane's name with his own on an LLC document despite there being "no evidence before the court that there is any permission from Shane Baker to take something *out of his name*." *Id.* at 129 (emphasis added).

- That Matthew's scheme was "to obtain money from . . . Shane Baker from whom he had promised the proceeds [that is, the assignment fee] to pay [the loan] back." *Id.* at 131.

8

Before the case was submitted to the jury, the government argued in closing:

- That Matthew's scheme was to lie to Old Republic "to get the assignment fee for himself personally, *in full*." *Id.* at 200 (emphasis added).

- That "the heart of the scheme" turned on "who ha[d] a right to that money [that is, the *full* assignment fee]." *Id.* at 206.

- That Matthew never called Shane to tell him that the deal closed and that he "got the money and the asset *in your name*[.]" *Id.* at 199 (emphasis added).

- That rather than call Shane to find a "way this could be resolved," Matthew "tried to *get the [assignment fee] for himself* other ways." *Id.* at 201 (emphasis added).

If the theory of prosecution were as the majority says, the government would have had no reason to refer repeatedly to Shane's control over the assignment fee. The government could merely have shown that Matthew was entitled to the fee (a fact it does not dispute on appeal), and that he attempted to deceive Shane about repayment of the loans. Instead, when Matthew presented evidence to the jury that he had the right to remove Shane as a manager, the government challenged that because it would "give Matthew Baker everything." App. vol. VII, at 203. That argument makes sense only if the government's theory was that Shane had a property interest in the assignment fee itself.

The trial record amply demonstrates that the government argued to the jury that Shane was defrauded of his "property interest specifically in the assignment fee." Maj. Op. at 8. The government's new appellate theory,

9

adopted by the majority, is that Shane had "a property interest in the $445,000 debt that Matthew owed him" and that "Matthew's fraudulent scheme was to prevent Shane from collecting on that debt." *Id.*; *accord* Resp. Br. at 20–21. The government did not present this theory to the jury. So affirming on this theory is error. *Ciminelli*, 598 U.S. at 316–17.

### 2. Old Republic

The government's other victim, Old Republic, was almost an afterthought at trial. The government argued that Old Republic's property interest was the avoidance of being sued. Specifically, the government asserted that Matthew's lie about his entitlement to the fee exposed Old Republic to potential liability if it distributed the assignment fee to the wrong recipient. App. vol. VII, at 131 (arguing at the Rule 29 conference that Old Republic was a victim because it "was financially liable should they disburse the funds that were in their control and custody at that time to the wrong individual"); *id.* at 192 (arguing in closing that Old Republic has "to make sure that the money goes where it is supposed to go. And if they don't do that, if they send it to the wrong person, they can be responsible"); *id.* at 207 (arguing in closing that "it wasn't just fraud for Shane Baker, deceiving him to prevent him from getting the money, it was also fraud on Old Republic who was responsible and liable should they disburse those funds"). The majority's analysis is silent on the merits of this theory. *See* Maj. Op. at 17–22.

10

The government is mostly silent on that theory too, defending it with a solitary sentence in its appellate brief. Resp. Br. at 23 ("Old Republic Title can be held liable if it disburses funds contrary to the escrow agreement's instructions."). Most of the government's appellate argument relies on a new property theory. Citing *Shaw v. United States*, 580 U.S. 63 (2016), it argues that Old Republic functioned like a bailee over the assignment fee. Resp. Br. at 21–22. And as a bailee, it "had a property right in the funds that enabled it to hold property against all except those identified in the transaction documents." *Id.* at 22–23.

The majority affirms on a slightly different theory, concluding that as an *escrow* agent, Old Republic (1) had "obtain[ed] exclusive advantages" over the funds, and (2) "had the right to possess the deposited funds against all the world except the parties to the escrow agreement." Maj. Op. at 19–20 (citation modified) (citing *Shaw*, 580 U.S. at 66). But the government never argued to the jury that Old Republic's purported avoidance-of-liability property right arose from its property rights as an escrow agent. Here too the majority's analysis erroneously ignores the wire-fraud theory the government presented to the jury and affirms on an alternative theory. *Ciminelli*, 598 U.S. at 316–17.

## B.    The Majority's Expansive Wire-Fraud Theory

The majority concludes that Shane had a cognizable property interest because "a scheme that interferes with a victim's right to 'collect money' from the defendant deprives that victim of a traditional property right." Maj. Op. at

11

14 (quoting *Pasquantino*, 544 U.S. at 355). Though I agree that the right to collect money can be a cognizable property right, I don't think Shane's situation fits within that property right.

I detect two material differences between our case and every case the majority cites in its analysis. First, as each of the majority's cases reflect, the Supreme Court requires that the defendant's fraud *targets* the victim's property. Here, Matthew's fraud—lying to Old Republic so it would distribute the assignment fee to his personal bank account—targeted only Old Republic's property, not Shane's. Shane's purported victimhood—interference with being repaid on a debt from an unrelated transaction—was an incidental byproduct of Matthew's lie to Old Republic. Second, each case the majority cites requires that a victim have a right to collect "money *legally due*." *Pasquantino*, 544 U.S. at 356 (emphasis added). The majority simply assumes that Shane could obtain a judgment against Matthew for the $445,000.

I start with a discussion of the cases that the majority relies on to support its wire-fraud theory. Then I explain the two ways that the majority has failed to match Shane's situation to those presented in its cited cases: (1) that Matthew's fraud targeted Shane's property and (2) that Shane was legally due repayment on the loans.

### 1.    Legal Background

In *Pasquantino*, the Supreme Court held that defendants who smuggled liquor into Canada to evade Canada's excise taxes defrauded Canada of its

12

property right to the taxes in fact owed. 544 U.S. at 353, 355; *see* Maj. Op. at 13–15. The Court looked to the defendants' "legal obligation" to pay Canada the excise taxes and reasoned that if the defendants "[h]ad . . . complied with this legal obligation, they would have paid money to Canada." *Id.* at 356. So the Court concluded that "the object of [the defendants'] scheme was to deprive Canada of *money legally due*, and their scheme thereby had as its object the deprivation of Canada's 'property.'" *Id.* (emphasis added). It also looked to common-law fraud, which treated "[t]he right to be paid money . . . [as] a species of property." *Id.* For example, a debtor committed common-law fraud if he "concealed his assets when settling debts with his creditors." *Id.* But that would be so only because of "the economic equivalence between money in hand and *money legally due*." *Id.* (emphasis added).

Likewise, in *United States v. Hoffman*, the Fifth Circuit held that defendants who had lied to receive state tax credits defrauded Louisiana of a property right to taxes owed. 901 F.3d 523, 531, 537 (5th Cir. 2018); *see* Maj. Op. at 14. Relying on *Pasquantino*, the Fifth Circuit concluded that fraudulently receiving tax credits "has the same effect as lying to evade taxes" because "the state collects less money" than it is "otherwise *owed*." *Hoffman*, 901 F.3d at 537 (emphasis added). The Fifth Circuit also relied on the common-law-fraud principles that *Pasquantino* did. *Id.* at 536 ("Common law fraud encompassed both defrauding a victim of money and of her entitlement to that money because of the 'economic equivalence between money in hand and

13

money legally due.'" (quoting *Pasquantino*, 544 U.S. at 356)). And it looked to

its own precedent involving wire fraud in the private sector. *Id.* at 538. Those

decisions held that fraudulently obtaining an airplane ticket or "swindling

reward miles that can be redeemed for free flights" were schemes to defraud

property because in both situations the defendant takes "revenue *lawfully owed*

the airline."[5] *Id.* at 538 (emphasis added) (first citing *United States v. Morris*,

348 F. App'x 2, 3–4 (5th Cir. 2009) (per curiam), then citing *United States v.*

*Loney*, 959 F.2d 1332, 1336 (5th Cir. 1992)).

And in *United States v. Sullivan*, the Second Circuit held that employees

who misused federal-grant funds on lavish trips defrauded their company of its

"enforceable [contractual, property] right" to those funds. 118 F.4th 170, 181,

---

[5] The Ninth Circuit reached a similar conclusion in *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010). There, the court held that defendants who lied to obtain discounted Microsoft software had defrauded Microsoft of its property right to receive full payment. *Id.* at 1067–68. The court ruled that Microsoft had a "right to full payment" and that the defendants had defrauded it of "payment *rightly due*." *Id.* at 1067, 1069 n.4 (emphasis added); *id.* at 1068 (concluding that Microsoft "lost property in its hand."). In other words, Microsoft lost revenue rightly owed it, which the court declared "mirror[ed] the loss of taxes due in *Pasquantino*." *Id.* at 1068.

And as the Ninth Circuit noted, we relied on similar reasoning in *United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989). *Id.* There, we held that defendants who lied to obtain discounted pharmaceuticals had defrauded the manufacturers of their right to receive full payment. *See Stewart*, 872 F.2d at 958, 960. We reasoned that because the defendants' fraud caused the manufacturers to charge lower prices than they otherwise would have, "the effect of the scheme was to deprive the manufacturers of money which they should have received on sales of pharmaceuticals to wholesalers." *Id.* at 960.

Though the majority cites both cases as supportive of its analysis, Maj. Op. at 15–16, neither case supports the majority's position because the cases depend on a creditor's having been defrauded of money that was *legally due*.

189, 209 (2d Cir. 2024); *see* Maj. Op. at 14. The Second Circuit reasoned that "*contractual rights* to payment have long been recognized as valuable property, even if the payment has not yet occurred." *Sullivan*, 118 F.4th at 209 (emphasis added). And it described *Pasquantino* as holding that "*enforceable rights* to payment are 'property' that, when wrongfully thwarted by a defendant, may underlie a criminal prosecution." *Id.* (emphasis added).

In *United States v. Jones*, the Ninth Circuit held that a defendant who embezzled over a million dollars from investors had defrauded them of a property right. 472 F.3d 1136, 1137, 1140 (9th Cir. 2007); *see* Maj. Op. at 15. There, the defendant learned of an investment opportunity called the Miracle Car Deal, in which luxury cars were offered at a reduced price. *Jones*, 472 F.3d at 1137. The defendant solicited over one million dollars from individual car buyers who were interested in purchasing a discounted luxury vehicle. *Id.* Eventually, the defendant discovered that the investment opportunity was a fraudulent scheme. *Id.* Rather than disclosing that information to his investors, he spent their money on himself. *Id.* When the investors asked for their money back, he told them that the government had seized the account where he kept their funds. *Id.*

On appeal, the defendant argued that this conduct didn't amount to "fraud" under the wire-fraud statute because he hadn't possessed a fraudulent intent when he received the investors' money. *Id.* at 1140. The Ninth Circuit rejected that argument, reasoning that he received the investors' "money that he

15

was supposed to keep safe and use only for the purchase of automobiles" and that he "l[ied] to investors about its disposition in order to avoid returning it to *its rightful owners*." *Id.* (emphasis added).

Finally, in *United States v. Van Doren*, the Eighth Circuit held that there was an adequate factual basis to support the defendant's plea to wire fraud for concealing a co-defendant's assets from his creditors. 800 F.3d 998, 1000, 1002–03 (8th Cir. 2015); *see* Maj. Op. at 15. But as his co-defendant's prosecution revealed, the scheme concealed his co-defendant's assets from "*judgment creditors*." *United States v. Knight*, 800 F.3d 491, 516 (8th Cir. 2015) (Gruender, J., concurring in part and dissenting in part) (emphasis added). Indeed, in his co-defendant's case, the government conceded that a debtor generally does not have to "keep creditors apprised of where their assets are located, particularly before the creditor has *obtained a judgment* against the debtor or utilized lawful means to locate and execute upon the debtor's assets." *Id.* at 505 (majority opinion) (emphasis added).

Contrary to these decisions, the majority "see[s] nothing in *Pasquantino* that would require Shane" to create a legally enforceable property in the debt. Maj. Op. at 14–15 (citing Reply Br. at 8–9). But without that requirement, the majority's qualification "that mere failure to pay a debt (absent a fraudulent scheme to frustrate collection) cannot be the basis for a mail-fraud or wire-fraud violation" is meaningless. It contends that a scheme to "impair the creditor's ability to collect what is due is a well-recognized predicate for the

16

crime." *Id.* at 15. But as I highlight above, each case the majority cites involves a scheme that impairs a creditors ability to collect what is *legally due*.

### 2. Analysis

The majority's application of those cases to Shane's situation presents two independent problems. First, in fraud cases, we "ask[] . . . whether the targeted property was in fact property in the hands of the victim." *Shaw*, 580 U.S. 68–69; *accord Cleveland*, 531 U.S. at 26 (holding that the wire-fraud statute "requires the object of the fraud to be 'property' in the victim's hands"). It's not sufficient if the victim's loss of property "is only an incidental byproduct of the scheme." *Kelly*, 590 U.S. at 402. Matthew's fraud—lying to Old Republic so it would release the assignment fee to him—targeted Old Republic's property, not Shane's. That should end the analysis. Instead, according to the majority, Shane had a property interest in being repaid the money he gave to Matthew in unrelated transactions. The majority reasons that because Matthew didn't use the assignment fee to repay Shane, he also defrauded Shane of his property interest in being repaid. In other words, Matthew defrauded Shane even though his fraud *never targeted* Shane's property. That means Shane's loss was merely "an incidental byproduct" of the scheme. *Id.* That is a significant expansion of the wire-fraud statute. *Cf. Cleveland*, 531 U.S. at 15 ("It does not suffice . . . that the object of the fraud *may* become property in the recipient's hands[.]" (emphasis added)). After today's decision, a defendant commits wire fraud if he receives money

17

*unrelated* to his debt and fails to inform the person who lent him money. None of the majority's cases involve a wire-fraud theory that broad, and I think the majority has wrongly expanded our standard.

Second, even if I thought the majority's expansive wire-fraud theory was cognizable, I do not see sufficient evidence to sustain a conviction. Shane didn't have a judgment or any other legally enforceable right against Matthew for the $445,000 loan. At most, he had a potential claim against Matthew for breach of contract. And the record reveals that claim is no sure bet.[6] The

---

[6] Because the appellate record contains few details about the loans, I'll assume Utah law would apply to any potential breach-of-contract claim. To start, transfers of money among close family members are often treated as gifts rather than enforceable loans. *Finlayson v. Finlayson*, 874 P.2d 843, 848 (Utah Ct. App. 1994) ("Whether moneys received from close family members represent a gift or a debt can be problematic."); *West v. West*, 403 P.2d 22, 25 (Utah 1965) (noting that though clear and convincing proof is typically required to prove that a transfer was a gift, in the case of a transfer among close family, a "court may place some reliance on the fact that it is natural to make a gift to a member of one's family"); *see Estate of True v. C.I.R.*, 390 F.3d 1210, 1237–38 (10th Cir. 2004) (noting that federal tax law subjects "transactions within a family group . . . to special scrutiny, and the presumption is that a transfer between family members is a gift" (citation modified)).

Even if we assume that a court would treat the transfers as loans, the loans would likely be unenforceable. The only written agreement Shane and Matthew had was for the initial $250,000 loan. But it's not clear there was adequate consideration because Shane charged Matthew no interest on the loan. What's more, because the agreement is not in the appellate record, we can't tell whether it has other terms that would make it enforceable. *Mortensen v. Mortensen*, 564 P.3d 508, 514 (Utah Ct. App. 2025) ("There is consideration whenever a promisor receives a benefit or where a promisee suffers a detriment, however slight." (citation modified)).

For the remaining $195,000, I question whether Shane could have shown that he had an enforceable express oral agreement either. In Utah, an express oral agreement is unenforceable if its "essential terms are so uncertain that

*(footnote continued)*

18

majority smooths over these gaping flaws on its path to affirming Matthew's conviction, relying on no comparable cases. As I read the cited cases, none support the majority's decision.

*    *    *

For these reasons, I would reverse Matthew's conviction on Count One. For that count, I respectfully dissent.

---

there is no basis for deciding whether the agreement has been kept or broken." *Goggin v. Goggin*, 267 P.3d 885, 893 (Utah 2011); *accord Turley v. Childs*, 515 P.3d 942, 954 (Utah Ct. App. 2022) ("What matters is whether the oral agreement, as articulated and understood, is sufficiently definite to be enforceable."). The record reveals that Shane loaned Matthew the interest-free money with no specific terms on when or how Shane would be repaid. *See* App. vol. III, at 88 (email from Shane to Matthew explaining that he "do[es] expect to get paid" with no reference to any repayment terms, and commenting that Matthew's "get rich schemes will always take precedence over *keeping your word[]* and paying back a brother" (emphasis added)). Even if Shane could demonstrate adequate consideration on those interest-free loans, I see no definite terms of repayment that would permit a court to decide that the agreement had been breached. *See Goggin*, 267 P.3d at 893.

Alternatively, if Shane argued that Matthew orally agreed to repay him by giving him an interest in Cap Fund's real-estate assets, Shane wouldn't have a viable claim there either. Utah enforces a contract for the sale of an interest in land only if the agreement is in writing. Utah Code Ann. § 25-5-3 (2025).

19